# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| PUNTA LIMA, LLC, | |
| **Plaintiff**, | |
| **v.** | **Civil No.** 19-1673 (FAB) |
| PUNTA LIMA DEVELOPMENT COMPANY, LLC, | |
| **Defendant.** | |
| PUNTA LIMA WIND FARM, LLC, | |
| **Plaintiff**, | |
| **v.** | **Civil No.** 19-1800 (FAB) |
| PUNTA LIMA DEVELOPMENT COMPANY, LLC, | |
| **Defendant.** | |

## OPINION AND ORDER

BESOSA, District Judge.

Hurricane María destroyed the parties' wind-powered electric generation project. Their business relationship is also in shambles. One side tells a story of an extortionist landlord blocking reconstruction of the project until it receives sums to which it has no entitlement. The other depicts a deadbeat tenant aligned with a designing bank who are trying to puncture property rights and contravene contractual bargains. As their tales whistle through the courthouse, the project lays in ruins.

The stormy relationship has brought a flood of litigation. Punta Lima, LLC ("Punta Lima") and Punta Lima Wind Farm, LLC ("Wind Farm," and together with Punta Lima, "Plaintiffs") filed complaints seeking declarations that Punta Lima Development Co., LLC ("Defendant") is not entitled to the rent it seeks and is not authorized to terminate the associated leases. <u>See</u> Docket Nos. 119, 120.[1] Wind Farm also requests a permanent injunction guaranteeing access to the project site during the lease terms, as well as restitution and damages for breach of contract, bad faith (dolo) in the performance of contractual obligations, and conversion. <u>See</u> Docket No. 119. Punta Lima and Wind Farm further desire preliminary injunctive relief guaranteeing access to the project site during the lease terms and blocking termination of the leases while this case is pending. <u>See</u> Docket Nos. 9, 12, 58, 87. Defendant asks the Court to dismiss the complaints, articulating an assortment of alternative arguments authorizing termination of the tenancy. <u>See</u> Docket Nos. 64 and 81.

It is left to the Court to discern the significant from the sound and fury. For the reasons discussed below, Defendant's motion to dismiss Punta Lima's complaint, (Docket No. 64,) is **DENIED**. Defendant's motion to dismiss Wind Farm's complaint,

---

[1] All docket references are to Civil No. 19-1673 unless otherwise noted.

(Docket No. 81,) is **GRANTED IN PART AND DENIED IN PART**.  Wind Farm's claims for conversion and restitution, (Docket No. 119 at pp. 30-32,) are **DISMISSED WITHOUT PREJUDICE**.  The requests for preliminary injunctive relief, (Docket Nos. 9, 12, 58,) will be resolved after an evidentiary hearing on January 24, 2020 at 9:00 a.m.  A trial on the merits of the remaining causes of action in the two complaints, (Docket Nos. 119 and 120,) will be consolidated with that hearing.

## I.   Background

### A.   Factual Background

The Court draws the following facts from the two complaints and the materials attached thereto.  See Docket No. 119 at pp. 1-24 & Exs. 1-38; Docket No. 120 at pp. 1-12 & Exs. 1-22; see also Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009) (explaining that, except for a certain narrow class of documents, Federal Rule of Civil Procedure 12(b)(6) permits a court to consider only facts and documents that are part of or incorporated into the complaint).  The Court "take[s] as true the allegations of the complaint[s], as well as any inferences [the Court] can draw from [them] in the plaintiff[s'] favor."  Zenón v. Guzmán, 924 F.3d 611, 615 (1st Cir. 2019).

### 1.   Description of the Parties

Wind Farm was organized to own the wind-powered electric generation project ("project").  See Docket No. 119 at p. 20.  All of Wind Farm's activities consist of its Puerto Rico operation.  Id.

Defendant is a limited liability company.  Id. at p. 6.  Its members are citizens of Puerto Rico.  Id.

Wind Farm and Defendant used to be affiliates.  See id. at pp. 1-3.  That relationship changed hours before the first complaint in this judicial proceeding was filed on July 15, 2019.  See Docket No. 120 at p. 7.  Since July 15, Punta Lima has held the membership interest in Wind Farm.  Id.

Punta Lima is a limited liability company.  Id. at p. 2.  Punta Lima is a wholly owned subsidiary of Santander Bank, N.A. ("Santander"), a national banking association located in Delaware.[2]  Id. at p. 3.

### 2.   Land Leases and Related Agreements

The project uses three parcels of land.  Id. at pp. 4-5.  One parcel is owned by Defendant.  Id. at p. 4.  Defendant leased the parcel to Wind Farm in 2012.  Id.

---

[2] Based on the allegations set forth in Punta Lima's third amended complaint, see Docket No. 120 at pp. 2-3, and Wind Farm's second amended verified complaint, see Docket No. 119 at pp. 5-6, the Court is satisfied that diversity jurisdiction exists between the parties, see 28 U.S.C. § 1332(a).

Two other parcels are owned by third parties. <u>See</u> <u>id.</u> at pp. 4-5. Wind Farm leased both parcels from their owners. <u>Id.</u> Afterwards, in 2012, Wind Farm assigned its interests and obligations in those leases to Defendant, then subleased the land from Defendant. <u>Id.</u>

Wind Farm and Defendant also reached other accords at around the same time those leases and subleases were agreed upon. (Docket No. 119 at pp. 7-9.) Among these accords was an agreement that, should Wind Farm default on the lease or subleases between Wind Farm and Defendant, Punta Lima would have the right, but not the obligation, to cure the default. <u>Id.</u> Defendant also granted Punta Lima the right to enter the three parcels during the term of the lease and subleases between Wind Farm and Defendant. <u>See</u> <u>id.</u>, Ex. 2 at p. 3 & Ex. 6 at p. 3 & Ex. 10 at p. 3.

In this opinion, the three land parcels discussed above are collectively described as the "project site." The leases, subleases and related agreements between Defendant and Wind Farm discussed in the three preceding paragraphs are collectively described as the "land leases."

### 3. Equipment Lease

Approximately a week after the land leases were consummated, Wind Farm and Santander entered into a lease ("facility lease"). (Docket No. 120 at p. 5.) Through the

facility lease, Wind Farm leased wind-powered generating equipment and related material from Santander.  Id. at pp. 5-6.  Santander later assigned its interests in the facility lease to Punta Lima. Id. at p. 6.

The facility lease addresses destruction of the project.  (Docket No. 119, Ex. 11 at p. 23.)  If the project is destroyed, Wind Farm can choose either to rebuild the project or to terminate the facility lease.  Id.  The facility lease requires Wind Farm to choose within four months of the destructive incident or be deemed to have elected to terminate the agreement.  Id.  In the event of termination, Wind Farm owes Punta Lima a sum referred to here as the "termination payment."  See id., Ex. 11 at p. 24.

### 4.  Subordination Agreement

Defendant and Wind Farm also executed a subordination agreement ("subordination agreement").  Id., Ex. 12. Defendant agreed to subordinate Wind Farm's payment obligations to itself (except those concerning rent payments to the third-party owners of the two land parcels) in favor of Wind Farm's obligations to Punta Lima.  Id., Ex. 12 at p. 2.  Specifically, the agreement states,

> [Defendant] hereby consents and agrees to (i) the
> subordination of all the payment obligations of [Wind
> Farm] under the Punta Lima Lease, including, but not
> limited to, the payment of rent or any other payments
> due by [Wind Farm] to [Defendant] under the Punta Lima
> Lease, and (ii) the subordination of all payment
> obligations of [Wind Farm] to [Defendant] under each of
> the Subleases, except for that portion of the annual
> rent payable to each respective Owner in each case, in
> favor of any and all the obligations of [Wind Farm] owing
> to [Punta Lima] under, or pursuant to, that certain
> Facility Lease Agreement . . . .

Id.

Defendant and Wind Farm thereafter amended their sublease agreements to reflect the subordination. Id., Ex. 13 at p. 4 & Ex. 14 at pp. 4-5. The amended subleases refer broadly to Wind Farm's "obligations," stating,

> [Defendant] hereby consents and agrees to the
> subordination of all the obligations of [Wind Farm]
> under the Sublease, including, but not limited to, the
> payment of rent or any other payment due by [Wind Farm]
> to [Defendant] under the Sublease, in favor of any and
> all obligations of [Wind Farm], now existing or
> hereinafter constituted, with [Punta Lima], as the same
> may be amended, restated or in any way modified from
> time to time, except for that portion of the annual rent
> payable by [Defendant] to the [third-party landowner].

Id., Ex. 13 at p. 4 & Ex. 14 at pp. 4-5.

## 5. Project Operation and Destruction

Wind Farm operated the project through September 19, 2017. Id. at p. 11. Defendant was compensated. Id.

Hurricane María destroyed the project on September 20, 2017. Id. Since then, the project has been inoperative. Id.

### 6.    Negotiations After Destruction of the Project

After the hurricane, the parties and their parent companies began negotiations to rebuild the project.  Id. at pp. 12-13, 22-23.  These negotiations are ongoing.  Id. at p. 13.

In 2018 and early 2019, Defendant did not assert there was unpaid rent.  Id. at p. 22.  Meanwhile, Wind Farm approved all withdrawal requests from Defendant for rent payments and management fees.  Id. at p. 23.  At this time, Defendant and Wind Farm were still under common control.  Id.

In 2018 and 2019, Punta Lima and Santander agreed to extend the time in which Wind Farm was required to decide whether to rebuild the project or terminate the facility lease. Id. at pp. 12-13.  According to Punta Lima, the final date for Wind Farm's decision was set at March 15, 2019.[3]  Id. at p. 13.

Wind Farm did not decide by the final decision date whether to rebuild or terminate.  Id.  Consequently, Wind Farm was deemed to have elected to terminate the facility lease.  Id.

---

[3] Defendant disputes this date, asserting that the final date for Wind Farm's decision was set at April 30.  See Docket No. 92 at p. 2; Docket No. 81 at p. 3; Docket No. 64 at p. 4 & Ex. 1.  To the extent Defendant makes factual assertions and offers exhibits not fairly incorporated into Plaintiffs' complaints, the assertions and exhibits are not considered in this opinion.  Rivera, 575 F.3d at 15.  In any event, as discussed below, this dispute is immaterial to the Court's disposition.

### 7.    Wind Farm Defaults on Land Leases

On May 9 and 31, 2019, Defendant informed Wind Farm of defaults pursuant to the land leases. Id. at pp. 13–14. According to the notices, Wind Farm failed to pay rent due in February 2018 and February 2019. Id. The notices did not calculate or describe the amounts owed. Id. Defendant required payment of unpaid rent within ten days. See id., Exs. 20–22.

Additionally, in late June, Defendant sent Punta Lima notices of Wind Farm's default. Id. at p. 14. According to the notices, the total amount of unpaid rent on the land leases was $782,998. See id., Exs. 23–25. In those notices, Defendant granted Punta Lima thirty days to cure Wind Farm's default. Id. Defendant also provided a table of the amount owed. Id. at p. 15; see id., Ex. 26. Punta Lima requested additional information concerning the amount owed, but Defendant has not provided that information. See Docket No. 120 at p. 9.

Plaintiffs dispute the rent calculations in the notices and table for the years 2017, 2018, and 2019. See Docket No. 119 at pp. 15–17; Docket No. 120 at p. 9. Plaintiffs aver that no business interruption insurance payments related to Hurricane María's destruction of the project have been issued, contrary to an indication in the table. See Docket No. 119 at pp. 16–17; Docket No. 120 at p. 9. Additionally, Wind Farm states

that the rent owed to the third-party owners of one of the land parcels should be zero dollars after September 20, 2017, because that rent is calculated as a percentage of the project's energy sales and there have been no energy sales since Hurricane María destroyed the project.  See Docket No. 119 at pp. 16.

### 8.    Wind Farm Defaults on Facility Lease

Punta Lima sent two letters in late June and early July of 2019 to Wind Farm.  Id., Exs. 28-29.  These letters notified Wind Farm of the occurrence of default pursuant to the facility lease and demanded immediate payment.  Id.  Among the reasons for default was Wind Farm's failure to pay the termination payment.  Id. at p. 17.

In addition, through its first letter, Punta Lima invoked a right to exercise the rights and powers of the membership interest in Wind Farm.  See id., Ex. 28 at p. 2.  In the second letter, Punta Lima notified Wind Farm that a private sale of Wind Farm could occur after July 12, 2019.  Id., Ex. 29 at p. 3.  Wind Farm did not cure the facility lease default.  Id. at p. 17.

### 9.    Punta Lima Acquires Wind Farm

By an agreement effective on the morning of July 15, 2019, Punta Lima acquired all interests in Wind Farm ("foreclosure sale agreement").  Id. at pp. 17-18; Docket No. 120, Ex. 12 at p. 2.  The foreclosure sale agreement provides,

> [S]ubject to the conditions set forth herein, the
> purchase price for the [Wind Farm membership interests]
> shall be $18,944,097.00 . . . which shall be payment for
> the obligations of [Wind Farm] owed to [Punta Lima] under
> the Facility Lease Agreement. . . . [Punta Lima] shall
> cause its books and records to reflect such payment by
> [Wind Farm] to [Punta Lima] under the Facility Lease
> Agreement.

(Docket No. 120, Ex. 12 at p. 2.)  The foreclosure sale agreement also states that Punta Lima does not assume and will not be responsible for Wind Farm's debts or the operation of its business. Id.  Finally, the foreclosure sale agreement states that it "may be amended, modified or supplemented only by written agreement of the parties" to the agreement.  Id., Ex. 12 at p. 3.

At the same time, Punta Lima and Wind Farm also agreed to terminate the facility lease ("facility lease termination agreement").  See id., Ex. 12 at p. 8.  According the facility lease termination agreement, "[t]he Facility Lease is hereby terminated for all purposes and, notwithstanding any provision of the Facility Lease to the contrary, the Facility Lease shall no longer be of any force or effect."  Id.

Four days later, on July 19, the parties to the foreclosure sale agreement entered into an amended agreement ("amended foreclosure sale agreement").  Id. at p. 7.  Punta Lima states that the purpose of the amended agreement, among other things, was to clarify that the purchase price in the foreclosure

sale constitutes a partial payment for Wind Farm's obligations to

Punta Lima.  Id.  The amended foreclosure sale agreement provides,

> [S]ubject to the conditions set forth herein, the
> purchase price for the [Wind Farm membership interests]
> shall be . . . $18,944,097.00 . . . which shall be
> payment in part for the obligations of [Wind Farm] owed
> to [Punta Lima] under the Facility Lease Agreement,
> including payment of the [termination payment]. . . .
> [Punta Lima] shall cause its books and records to reflect
> such payment . . . by [Wind Farm] to [Punta Lima] as a
> credit against the amounts (including the [termination
> payment]) owed by [Wind Farm] under the Facility Lease
> Agreement.

Docket No. 119, Ex. 30 at p. 2 (underlying added to identify new

language in amended agreement).

### 10.  Punta Lima Files a Complaint

July 15, 2019 was also the date that the first

complaint in this case was filed.  See Docket No. 1.  The

procedural background to this case is further discussed below.

### 11.  Defendant Prohibits Entry to Land

Since July 15, Defendant has generally prohibited

representatives of Wind Farm and Punta Lima from accessing the

project site.  See Docket No. 119 at pp. 3, 18–19.  On July 18,

2019, a security guard at the project site filed a trespass

complaint with police when Plaintiffs' representatives sought

entry.  Id. at pp. 18–19.  Defendant then sent a letter stating

its intention to continue to deny access to the project site.  Id.

at p. 19.  Plaintiffs responded that the actions constituted a *de facto* eviction without judicial authorization.  Id.

### 12. Defendant Terminates the Land Leases

On July 27, Defendant sent to Plaintiffs notifications that it was terminating the land leases.  Id. at pp. 19-20.  Defendant gave Wind Farm ninety days to remove its possessions.  Id.

In the termination notices, Defendant claimed that Wind Farm owed $962,998 in unpaid rent  Id. at p. 20.  This amount is approximately $180,000 more than was indicated in the earlier notices of default.  Id.

### 13. Steps Toward Rebuilding the Project

Punta Lima and Wind Farm have taken steps toward rebuilding the project.  Id. at pp. 20-21, 23-24.  These steps include making advance payments of more than ten million dollars for new wind-powered generating equipment.  Id. at p. 23.  They also include engagement of third parties to assess reconstruction and begin rehabilitation efforts.  Id.  The third parties require access to the project site.  See id. at pp. 23-24.

### 14. Financial Arrangements Associated with Rebuilding the Project and Their Respective Deadlines

Wind Farm and Puerto Rico Electric Power Authority ("PREPA") are counterparties to an agreement ("power purchase

agreement") to sell electric power from the project to PREPA. <u>See</u> <u>id.</u> at pp. 2, 11. The power purchase agreement states that it will terminate if the project is not capable of delivering electric power for thirty consecutive months. <u>See</u> <u>id.</u> at pp. 11–12. March 20, 2020 is thirty months after September 20, 2017 (the date Hurricane María destroyed the project). <u>Id.</u> at p. 12. Wind Farm and PREPA have agreed to extend the termination date to December 2020. <u>Id.</u>

The project is also the beneficiary of a tax incentive. <u>Id.</u> at pp. 2, 20. Wind Farm, Punta Lima, and Defendant are all co-grantees of the tax incentive. <u>Id.</u> at p. 20. The tax incentive requires the project to remain operational. <u>Id.</u>

Additionally, Wind Farm holds an insurance policy that covers damages to the project from Hurricane María. <u>Id.</u> at pp. 2, 12. The policy requires that reconstruction commence within two years of the date of the incident. <u>Id.</u> at p. 12.

**B.  Procedural Background**

On July 15, 2019, Punta Lima filed a complaint against Defendant seeking declaratory relief. (Docket No. 1.) Punta Lima thrice amended the complaint. (Docket Nos. 7, 50, 120.)

Punta Lima asserts four causes of action. <u>See</u> Docket No. 120 at pp. 12–14. All the causes of action seek a declaratory judgment. <u>Id.</u> Punta Lima asks the Court to declare that Defendant

is precluded from collecting the rent it seeks for the land it owns; that Defendant is precluded from collecting the rent it seeks for each of the two parcels it leases from third party owners to the extent Defendant claims an amount greater than is owed to the third party owners; and that Defendant is precluded from terminating the land leases. Id.

Defendant moved to dismiss Punta Lima's second amended complaint. (Docket No. 64; Docket No. 83, Exs. 1-3.) That filing was Defendant's responsive pleading. (Docket Nos. 65, 67.) Punta Lima opposed the motion to dismiss. (Docket No. 85.) Defendant replied. (Docket No. 92.) Punta Lima filed a surreply. (Docket No. 100.)

Also on July 15, Punta Lima deposited with the clerk of court a check in the amount of $782,998. See Docket No. 2. The associated informative motion was noted by Judge Jay A. García-Gregory. (Docket No. 6.)

In late July, Punta Lima moved for a tailored preliminary injunction to allow access to the project site. (Docket No. 9.) Following Punta Lima's request for injunctive relief, Civil No. 19-1673 was randomly reassigned to this Court. (Docket No. 10.) Defendant opposed the injunction. (Docket No. 64.) Plaintiffs replied. (Docket No. 74.) Defendant filed a surreply. (Docket No. 84.)

In early August, Punta Lima moved for another preliminary injunction. (Docket No. 12.) The requested injunction would maintain the status quo of the contractual relationship with Defendant and, correspondingly, preclude the Defendant from terminating the land leases. See id. at p. 1. Defendant opposed that injunction, too. (Docket No. 64.) Plaintiffs replied. (Docket No. 74.) Defendant filed a surreply. (Docket No. 84.)

In late August, Wind Farm filed a verified complaint against Defendant. (Civil No. 19-1800, Docket No. 1.) After the dockets were consolidated, see Civil No. 19-1800, Docket No. 18; Civil No. 19-1673, Docket No. 25, Wind Farm amended the verified complaint, (Docket No. 51.) Wind Farm later filed a second amended verified complaint. (Docket No. 119.)

Wind Farm asserts six causes of action. Id. at pp. 24–33. Wind Farm seeks a declaration that Defendant is precluded from terminating the land leases; a permanent injunction granting access to the project site during the land lease terms; damages for breach of contract, bad faith in the performance of a contract, and conversion; and restitution for rent collected in violation of the subordination agreement or in excess of the amount due. Id.

Defendant moved to dismiss Wind Farm's amended verified complaint. (Docket No. 81; Docket No. 83, Exs. 1–3.) Wind Farm

opposed the motion to dismiss. (Docket No. 99.) Defendant replied. (Docket No. 102.) Wind Farm filed a surreply. (Docket No. 115.)

After filing its verified complaint, Wind Farm moved for a temporary restraining order to allow it access to the project site. (Civil No. 19-1800, Docket No. 2.) The motion was denied by Judge Daniel R. Domínguez. (Civil No. 19-1800, Docket No. 7.)

In early September, after the dockets were consolidated, Wind Farm moved this Court for a temporary restraining order to allow it access to the project site. See Docket Nos. 26, 27. Defendant opposed the motion. (Docket No. 29.) This Court denied the motion for the restraining order because the materials before the Court indicated that Wind Farm could access the site pursuant to coordination with Defendant. (Docket No. 33 at pp. 8-9.) After negotiations between the parties, the posting of a bond, and the acquisition of insurance, see Docket Nos. 39-40, 42-43, Wind Farm obtained access to the site for approximately two weeks, see Docket No. 41 at pp. 1-2; Docket No. 42 at p. 2; Docket No. 45.

In late September, Defendant filed an informative motion stating that Plaintiffs were granted access for fifteen days to the project site. (Docket No. 54 at p. 2.) Defendant requested the Court take notice and deem the Court's order in Docket No. 33

as complied with.  Id.  In a line order, the Court noted the motion.  (Docket No. 55.)

On the same day, Plaintiffs filed an emergency motion requesting extension of access to the project site.  (Docket No. 58.) Defendant opposed the emergency motion.  (Docket No. 60.) Plaintiffs replied.  (Docket No. 74.)  Defendant filed a surreply. (Docket No. 84.)

In late October, Plaintiffs moved to deem as submitted the motions in Docket Nos. 9, 12, and 58.  (Docket No. 87.)  Without resolving the motion, the Court stated that "[t]his matter will be considered and decided in due course.  Of course, the parties may meet and attempt to resolve their differences, as sophisticated as they are."  (Docket No. 88.)

In November, Defendant filed an informative motion. (Docket No. 104.)  The motion states that PREPA has suspended discussions to renegotiate Wind Farm's power purchase agreement and, according to Defendant, it is unlikely that the power purchase agreement will remain viable.  Id. at p. 2.  The Court noted the motion in a line order.  (Docket No. 106.)  Plaintiffs responded to Defendant's informative motion, arguing that the motion is incorrect and the correspondence to which it refers is inapplicable to the project.  (Docket No. 108 at pp. 2-3.)

In mid-November, Plaintiffs filed a motion both to inform the Court of an impasse with respect to accessing the project site and to request a Court-ordered thirty-day access period. (Docket No. 109.) The Court denied the motion upon finding that Plaintiffs failed to show likely irreparable harm in the absence of a preliminary injunction granting such access. (Docket No. 111 at pp. 6-9.)

In summary, the Court has before it the following: Plaintiffs' last amended complaints, <u>see</u> Docket Nos. 119, 120; Defendant's two motions to dismiss, <u>see</u> Docket Nos. 64 and 81; Plaintiffs' three motions for preliminary injunctive relief, <u>see</u> Docket Nos. 9, 12, 58; and Plaintiffs' motion to deem as submitted the motions in Docket Nos. 9, 12, and 58, <u>see</u> Docket No. 87.

## II. Defendant's Motions to Dismiss

### A. Legal Standard

Rule 12(b)(6) permits a defendant to move to dismiss an action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive the motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible if, after accepting as true all non-conclusory factual

allegations, the court can draw the reasonable inference that the defendant is liable for the misconduct alleged. Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [a court] to draw on [its] judicial experience and common sense." Zenón, 924 F.3d at 616 (internal quotation marks omitted). A court must decide whether the complaint alleges sufficient facts to "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. The burden is on the plaintiff to allege a viable cause of action plausibly. Hochendoner v. Genzyme Corp., 823 F.3d 724, 730 (1st Cir. 2016).

Assessing the adequacy of a complaint in the First Circuit involves two steps. Zenón, 924 F.3d at 615-16. First, a court "isolate[s] and ignore[s] statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." Id. at 615 (internal quotation marks omitted). Second, the court "take[s] the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor" to "see if they plausibly narrate a claim for relief." Id. at 615-16 (internal quotation marks omitted).

B.  **Analysis**

1.  **Plaintiffs' Causes of Action Seeking Declaratory
    Relief**

The Court first considers whether to dismiss
Plaintiffs' requests for declaratory relief.  The basis on which
each plaintiff seeks declaratory relief largely overlaps, and the
same goes for Defendant's arguments in its two motions,[4] so the
Court considers them all together.

i.  **Plaintiffs' Theory**

Before taking up Defendant's motions to
dismiss, it is useful briefly to sketch Plaintiffs' theory of the
case.  As a reminder, Plaintiffs generally seek declarations that
Defendant is not entitled to the rent it seeks and cannot terminate
the land leases.  See Docket No. 119 at pp. 24-25; Docket No. 120
at pp. 12-14.

Plaintiffs contend that Defendant's notices of
default are based on improperly inflated unpaid rental amounts.
See Docket No. 119 at p. 16; Docket No. 120 at p. 2.  In support,
Plaintiffs point out that Defendant's unpaid rent calculation
erroneously assumes payment of an insurance policy.  See Docket
No. 119 at p. 16; Docket No. 120 at p. 2.  Consequently, Plaintiffs

---

[4] In the future, all parties may wish to consider incorporating statements by
reference, see Fed. R. Civ. P. 10(c), as an alternative to duplicative filings.

assert that the unpaid rental amounts in the default notices are illiquid and therefore not due or payable pursuant to Puerto Rico law.  See Docket No. 85 at p. 11-14 (citing Citibank, N.A. v. Allied Mgmt. Grp., Inc., 466 F. Supp. 2d 403, 408-09 (D.P.R. 2006)); Docket No. 99 at pp. 12-14 (same).

Plaintiffs also contend that whatever unpaid rents are outstanding pursuant to the land leases are subordinated to Wind Farm's outstanding obligations to Punta Lima.  See Docket No. 119 at pp. 3-4; Docket No. 120 at p. 2.  Plaintiffs assert that the subordinated rent is not an adequate basis either to block access to the project site or to terminate the land leases.  See Docket No. 119 at pp. 3-4; Docket No. 120 at p. 2.

### ii. Whether Subordination Agreement Is Irrelevant Because Wind Farm Did Not Owe Facility Lease Rent When It Defaulted on Land Leases

Defendant first contends that the subordination agreement is irrelevant.  See Docket No. 81 at pp. 3-4, 11; Docket No. 64 at pp. 4, 11.  Defendant contends that when its notices of default were issued on May 9 and May 31, Wind Farm had not defaulted in its rental obligations to Punta Lima pursuant to the facility lease.  See Docket No. 81 at pp. 3-4, 11; Docket No. 64 at pp. 4, 11.  Defendant thus concludes that the rent due in May pursuant to the land leases was not subordinated to

anything.   See Docket No. 81 at pp. 3-4, 11; Docket No. 64 at
pp. 4, 11.

          Defendant's  argument  is  not  persuasive.
First, Defendant interprets the subordination agreement only to
subordinate obligations to Defendant that occur later in time than
obligations to Punta Lima.   The contract language, however, is far
from clear on this point.   By subordinating "all" of Wind Farm's
payment obligations to Defendant in favor of "any and all" of Wind
Farm's obligations to Punta Lima, the subordination agreement is
at least ambiguous on whether, if not clear that, there is no
temporal element to subordination.   See Docket No. 119, Ex. 12 at
p. 2.   An interpretation of ambiguous contract language is not an
adequate basis for dismissal.   See Young v. Wells Fargo Bank, N.A.,
717 F.3d 224, 235-36 (1st Cir. 2013).

          Second, even if there were a temporal element
to subordination, and further assuming the parties waived all
events of default until April 30,[5] the termination payment would
have been due by April 30 or May 1.   See Docket No. 119, Ex. 11 at
p. 24.   A default pursuant to the facility lease occurs where Wind
Farm fails to pay the termination payment within five days after

---

[5] The parties dispute whether the obligations were waived until March 15 or
April 30.   Compare Docket No. 85 at p. 15 and n.6 (arguing that obligations
were waived until March 15), with Docket No. 92 at p. 2 (arguing that
obligations were waived until April 30); Docket No. 81 at p. 3 (same); Docket
No. 64 at p. 4 and Ex. 1 (same).

the sum is due.  See id., Ex. 11 at p. 35.  That is days before

Defendant's first notice of default and weeks before its two other

notices.  See id., Ex. 33 at pp. 4, 11, 19.  Even under Defendant's

theory, then, the subordination agreement is not irrelevant.

### iii. Whether the Subordination Agreement Does Not Prohibit Termination of Land Leases for Failure to Pay Rent

Defendant next contends that the subordination

agreement only postpones rent collection rights and does not waive

the right to terminate the land leases for rent payment default.

See Docket No. 81 at pp. 4–6, 11–12; Docket No. 64 at pp. 4–6, 11–

12.  According to Defendant, the subordination agreement neither

modifies the land leases' definition of default events nor

extinguishes the possibility of terminating the land leases if

Wind Farm defaults on its rent payment obligations.  See Docket

No. 81 at p. 5, 11–12; Docket No. 64 at pp. 5, 11–12.  Defendant

points to a provision in the subordination agreement declaring

that "all the terms and conditions of the Leases will continue to

remain in full force and effect" and that the subordination

agreement "shall in no way, manner or form be construed or be

interpreted as an extinctive novation of any of the obligations

and agreements set forth in the Leases."  See Docket No. 81 at

p. 11–12 (quoting Docket No. 119, Ex. 12 at p. 2); Docket No. 64

at p. 11–12 (same).

The subordination agreement states that it "shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico." (Docket No. 119, Ex. 12 at p. 3.) The Court looks to Puerto Rico law for the substantive rules of decision. In re Redondo Constr. Corp., 678 F.3d 115, 125 (1st Cir. 2012); New Ponce Shopping Ctr., S.E. v. Integrand Assurance Co., 86 F.3d 265, 267-68 (1st Cir. 1996).

The fundamental criterion for contract interpretation in Puerto Rico is the contracting parties' intent. P.R. Tel. Co., Inc. v. Sprintcom, Inc., 662 F.3d 74, 90-91 (1st Cir. 2011). "Under Puerto Rico law, '[i]f the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." In re Advanced Cellular Sys., Inc., 483 F.3d 7, 12 (1st Cir. 2007) (alteration in original) (quoting P.R. Laws Ann. tit. 31, § 3471); see Marina Indus., Inc. v. Brown Boveri Corp., 14 P.R. Offic. Trans. 86, 94-98 (1983) (explaining that a court must abide by the literal meaning of contractual terms when the terms leave no doubt as to the contracting parties' intention). "An agreement is clear when it can 'be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation.'" In re Advanced Cellular, 483 F.3d at 12 (quoting Catullo v. Metzner, 834 F.2d 1075, 1079 (1st Cir.

1987)).   If a court has doubts that the parties' intent is expressed in the contract's text, it should investigate the spirit and purpose of the transaction, the overall conduct of the interested parties, and the concurring circumstances.  <u>P.R. Tel. Co.</u>, 662 F.3d at 90-91.  After all, if the contract language "should appear contrary to the evident intention of the contracting parties, the intention shall prevail."  P.R. Laws Ann. tit. 31, § 3471.

        To be sure, Defendant's interpretation is one possible interpretation of the subordination agreement.  The subordination agreement references Wind Farm's "payment obligations" without expressly mentioning Defendant's right to terminate the leases.  <u>See</u> Docket No. 119, Ex. 12 at p. 2.  A term like "payment obligations," whatever its level of generality, "should not be understood as includ[ing] . . . things and cases different from those with regard to which the persons interested intended to contract."  P.R. Laws Ann. tit 31, § 3473.  By not expressly referencing termination rights and using a term—"payment obligations"—whose ordinary meaning might be distinguishable from termination rights, it is possible that the parties did not intend the subordination agreement to affect Defendant's termination rights.  And, of course, the language about no novations certainly cabins the subordination agreement's effect.  <u>Id.</u>

Defendant's interpretation, however, appears to be in tension with a tenet of Puerto Rican contract law. Pursuant to Puerto Rico law,

> when construing a contract, one must presuppose fairness, correction and good faith in its wording and construe it in such a manner that leads to results consonant with the contractual relationship as required by ethical standards.  In other words, one cannot seek to obfuscate or distort the interpretation of contracts to reach absurd or unfair results.

Autoridad de Carreteras y Transportación v. Transcore Atlantic, Inc., 128 F. Supp. 3d 485, 486 (D.P.R. 2015) (Besosa, J.) (internal quotation marks omitted).  The tension arises because Defendant's interpretation would allow Defendant to terminate the land leases based on nonpayment of rents even though Defendant agreed to a delay in payment of those same rents in circumstances that, Plaintiffs allege, exist here.  See Docket No. 119, Ex. 12 at p. 2.

Plaintiffs notice this issue and suggest an interpretation to avoid the tension.  See Docket No. 99 at pp. 20–21; Docket No. 85 at pp. 20–21; see also Docket No. 74 at pp. 15–18 (suggesting interpretation in context of likelihood to succeed on merits for purposes of preliminary injunction).  Not surprisingly, Plaintiffs believe the subordination agreement forestalls, until Wind Farm's obligations to Punta Lima are satisfied, both Wind Farm's obligation to pay rent and the right to terminate the leases associated with nonpayment.

Additionally, in circumstances that the subordination agreement renders pendent Wind Farm's obligation to pay rent to Defendant, it is arguable whether the land leases' requirement for an event of default—"failure to pay rent installments when due"—is satisfied. See, e.g., Docket No. 119, Ex. 1 at p. 5. And, in this way, the language about no novations does not lead to only one plausible interpretation. Plaintiffs' interpretation would not modify or extinguish the land leases' provision for termination upon "failure to pay rent installments when due." Rather, the interpretation says that, unless Wind Farm has satisfied its obligations to Punta Lima, there cannot be a failure to pay rent installments when due.

At this stage of the proceeding, those considerations preclude the Court from concluding that the contract language leaves no doubt as to the contracting parties' intention. In re Advanced Cellular, 483 F.3d at 12; Marina Indus., 14 P.R. Offic. Trans. at 94–98. Resolution of this interpretive issue will require consideration of the spirit and purpose of the transaction, the overall conduct of the interested parties, and the concurring circumstances. P.R. Laws Ann. tit. 31, §§ 3471, 3472; P.R. Tel. Co., 662 F.3d at 90–91. As such, Defendant's second argument is not a proper basis for dismissal because it

depends on interpretation of contract language that remains ambiguous. <u>Young</u>, 717 F.3d at 235.

> **iv. Whether the Subordination Agreement Is Void Because It Imposes a Purely Potestative Condition**

Defendant then moves to another argument. According to Defendant, Plaintiffs' interpretation of the subordination agreement would render it void as a purely potestative condition. <u>See</u> Docket No. 81 at pp. 15–16; Docket No. 64 at pp. 15–16. Puerto Rico law provides,

> If the fulfillment of the condition should depend upon the exclusive will of the debtor, the conditional obligation shall be void. If it should depend upon chance or upon the will of a third person, the obligation shall produce all its effects . . . .

P.R. Laws Ann. tit. 31 § 3043. Defendant notes that Punta Lima and Wind Farm are under common control. <u>See</u> Docket No. 81 at p. 16; Docket No. 64 at p. 16. Defendant contends that if the subordination agreement allows Wind Farm to forestall paying outstanding rent owed to Defendant until Wind Farm satisfies outstanding obligations to Punta Lima, then the subordination agreement imposes a condition on paying the land leases rent whose fulfillment is left to the exclusive will of those who control Punta Lima and Wind Farm. <u>See</u> Docket No. 81 at p. 16; Docket No. 64 at p. 16.

The Supreme Court of Puerto Rico's decision in

Jarra elaborates on the requirements of section 3043.  See Jarra

Corp. v. Axxis Corp., 2001 TSPR 162 (2001).  According to the Jarra

court, there are two types of "potestative conditions"—"purely

potestative conditions (in which the fulfillment of the obligation

depends exclusively on the will of one of the parties) and simple

potestative conditions (in which the fulfillment of the condition

is not subject to the exclusive will of one of the parties)."  Id.

Simple potestative conditions, the Jarra court explained, do not

render void the obligations that depend on them.  Id.

Simple potestative conditions, according to

the Jarra court, are found where a promisor is required to expend

some effort or sacrifice, even if the fulfillment of the condition

superficially appears to be merely at that party's whim.  The Jarra

court quoted a treatise as follows:

> [T]he situation undoubtedly changes when the obligation
> depends on the making of a decision by the obligor that
> requires from him an effort or a sacrifice.  Although
> the condition depends on the debtor, if it is not a
> purely potestative condition, but rather depends on the
> subjection of the obligor's conduct to a specific course
> of events, the condition will not have the effect of
> voiding the obligation . . . [that] depends on it.  No
> obligation is involved when a person limits himself to
> telling another person that he will sell him the house
> if he decides to do so, but the situation will be
> different if the first person tells the second person
> that he will sell him his house if he is transferred.
> In that case, as CASTÁN has stated, the potestative
> condition behaves more like the so-called mixed

condition. It is no longer something that depends on
the mere will of the obligor, but rather an act whose
occurrence limits the juridical freedom of a person who
must then consider himself to be truly bound.

Id. (quoting I-2 José Brutau, Fundamentos de Derecho Civil 97
(Bosch ed., rev. 3d ed. 1985).

        The Jarra court also discussed the role of
good faith efforts in distinguishing simple and pure potestative
conditions. The Jarra court partly based its holding that a
condition was purely potestative on the fact that a party "had
intended to be bound and, as a consequence of its obligation, . . .
was forced to make all necessary and reasonable efforts to fulfill
said obligation." 2001 TSPR 162. The Jarra court further
explained that it found persuasive a Louisiana decision stating
that a party has an implied obligation to put forth a good faith
effort to fulfill a suspensive condition. Id. (citing All. Fin.
Servs., Inc. v. Cummings, 526 So. 2d 324, 327 (La. Ct. App. 1988)).
In short, while the function of section 3043 is to condemn illusory
promises, Baetjer v. Garzot, 124 F.2d 920, 924 (1st Cir. 1942),
the thrust of the Jarra decision is that promises with an implied
duty of good faith and fair dealing are not illusory, see 2001
TSPR 162.

        The Jarra court's reasoning is in line with
the modern caselaw in common law courts. When presented with

promises that appear conditional on an event entirely within the promisor's control, common law courts have responded in two ways. Older cases considered the promises to be illusory and refused to enforce the associated bargain. 1 E. Allan Farnsworth, Farnsworth on Contracts § 2.13, at 133–35 (3d ed. 2004). More recently, courts have read the promises as including a promise to act in good faith or with reasonable efforts. Id. at 136–38. This is especially so "if the agreement is an elaborate one entered into by both parties with the evident intention that it be enforceable." Id. at 136.

The Court concludes that Defendant's argument fails. Even assuming Defendant is correct in some of the premises of its argument,[6] it is at least a plausible interpretation of the subordination agreement that Wind Farm has an implied duty of good faith and fair dealing in satisfying its obligations to Punta Lima. See Jarra, 2001 TSPR 162; cf. Nat'l Fed'n of the Blind v. The Container Store, Inc., 904 F.3d 70, 87 (1st Cir. 2018) (rejecting

---

[6] Plaintiffs take issue with Defendant's characterization of Punta Lima and Wind Farm as a single entity, noting that Wind Farm retains its corporate personhood. See Docket No. 99 at p. 22; Docket No. 85 at pp. 21–22. Plaintiffs also argue that section 3043 should not apply because the purported rent defaults occurred while Defendant and Wind Farm were under common control. See Docket No. 99 at p. 22; Docket No. 85 at pp. 21–22. Finally, Plaintiffs argue that Defendant's section 3043 argument amounts to little more than an abuse of law or rights. See Docket No. 99 at p. 22; Docket No. 85 at pp. 22. Because the Court concludes that the subordination agreement plausibly includes an implied duty of good faith or fair dealing which renders it a simple potestative condition, there is no need to consider Plaintiffs' other arguments at this stage.

argument that the duty of good faith and fair dealing avoids finding an illusory promise under Texas law because the Texas decisions on which appellee relies say nothing about good faith and fair dealing).

> **v.   Whether Wind Farm's Obligations to Punta Lima Survived Punta Lima's Acquisition of Wind Farm**

Even if the subordination agreement applies, Defendant next argues, there are no outstanding obligations pursuant to the facility lease that Wind Farm owes to Punta Lima. See Docket No. 81 at pp. 6–7, 12–14; Docket No. 64 at pp. 6–7, 12–14. According to Defendant, these obligations were extinguished in the foreclosure sale where Punta Lima acquired ownership of Wind Farm and terminated the facility lease. See Docket No. 81 at pp. 6–7, 12–14; Docket No. 64 at pp. 6–7, 12–14. In support of this argument, Defendant points to the following language in the foreclosure sale agreement: "the purchase price for the [Wind Farm membership interests] shall be $18,944,097.00 . . . which shall be payment for the obligations of [Wind Farm] owed to [Punta Lima] under the Facility Lease Agreement." See Docket No. 81 at pp. 6, 13 (quoting Docket No. 120, Ex. 12 at p. 2); Docket No. 64 at pp. 7, 13 (same). Defendant also notes that, in the facility lease termination agreement, the Plaintiffs indicated that the facility lease was terminated "for all purposes and, notwithstanding any

provision of the Facility Lease to the contrary, the Facility Lease shall no longer be of any force or effect." See Docket No. 81 at p. 14 (quoting Docket No. 120, Ex. 12 at p. 8); Docket No. 64 at p. 14 (same).

Defendant's argument cannot surmount the amended foreclosure sale agreement. The amended agreement expressly provides that the $18.9 million payment is only a partial payment of Wind Farm's obligations. Docket No. 119, Ex. 30 at p. 2.

So, Defendant offers two reasons why the Court should push aside the amended agreement. First, Defendant argues that Plaintiffs executed the amended foreclosure sale agreement to harm Defendant. See Docket No. 81 at pp. 16-19; Docket No. 64 at pp. 16-19. Consequently, Defendant asserts, the amended foreclosure sale agreement is null pursuant to Dennis v. City Fed. Sav. & Loan Ass'n, 21 P.R. Offic. Trans. 186 (1988). See Docket No. 81 at pp. 16-19; Docket No. 64 at pp. 16-19.

This argument is easily dispensed with.[7] Among the elements required to show a contract to harm a third party is "that there is intent to cause injury, either by both contracting parties or by only one of them." Dennis, 21 P.R. Offic. Trans.

---

[7] Plaintiffs stipulate, only in the context of Defendant's motions to dismiss, to the application of Puerto Rico law to the amended foreclosure agreement. See Docket No. 99 at p. 18 n.9; Docket No. 85 at p. 18 n.10.

at 202.  Neither Punta Lima nor Wind Farm alleges in its complaint
that it executed the amended foreclosure sale agreement with the
intent to injure Defendant.  See Docket Nos. 119, 120.  The amended
foreclosure sale agreement similarly lacks such a statement.  See
Docket No. 119, Ex. 30.  Defendant asks the Court to infer such
intent, see Docket No. 92 at pp. 8-9, but on a motion to dismiss
pursuant to Rule 12(b)(6) the Court draws all inferences in favor
of the non-movant, see Zenón, 924 F.3d at 615; Starr Surplus Lines
Ins. Co. v. Mountaire Farms Inc., 920 F.3d 111, 114 (1st Cir.
2019).  As such, Defendant's argument fails and there is no present
need to consider the parties' other Dennis arguments.

          Defendant's other attempt to sweep away the
amended foreclosure sale agreement amounts to nothing more than a
copy-and-paste of the integration clause in the foreclosure sale
agreement.  See Docket No. 81 at pp. 13-14 (citing Docket No. 120,
Ex. 12 at pp. 3-4); Docket No. 64 at 13-14 (same).  The argument
is undeveloped and, in any event, not persuasive in light of the
express provision in the foreclosure sale agreement that it "may
be amended, modified or supplemented . . . by written agreement."
(Docket No. 120, Ex. 12 at p. 3.)

          Furthermore, the fact that the facility lease
was terminated resolves nothing at this stage of the proceeding.
Manifold authorities hold that a tenant is liable after a lease is

terminated for unpaid rent while the lease was in effect.  <u>See,</u>
<u>e.g.</u>, Cal. Civ. Code § 1951.2(a)(1) (West 2019); 735 Ill. Comp.
Stat. Ann. 5/9-209 (West 2019); <u>Durm v. Am. Honda Fin. Corp.</u>, Civ.
No. 13-0223, 2013 WL 6490309, at *2 (D. Md. Dec. 9, 2013); <u>In re</u>
<u>Balistreri</u>, 8 B.R. 703, 705 (Bankr. E.D. Va. 1981); <u>Harder v. Dep't</u>
<u>of Fin. & Admin.</u>, 458 P.2d 947, 948-49 (Or. Ct. App. 1969).
Defendant offers no reason why the termination payment should be
treated differently.

### vi.  **Summary**

The careful reader will note that Defendant
offers no resistance to Plaintiffs' argument for declaratory
relief based on allegedly inflated amounts of unpaid rent in
Defendant's default and termination notices.  That alone largely
enables most of Plaintiffs' causes of action seeking declaratory
relief to sail to the next stage of this proceeding.

Anyhow, Defendant's efforts to sink
Plaintiffs' causes of action for declaratory relief do not warrant
dismissal.  In light of the considerations discussed above,
Plaintiffs have plausibly alleged a claim for the declaratory
relief they seek.  <u>See</u> Docket No. 119 at pp. 24-25; Docket No. 120
at pp. 12-14.

### 2. Wind Farm's Cause of Action for Permanent Injunctive Relief

Defendant argues the Court should dismiss Wind Farm's cause of action for permanent injunctive relief on the same basis it seeks dismissal of Plaintiffs' desired declaratory relief. See Docket No. 81 at pp. 21–23. For the reasons discussed above, the Court rejects the arguments.

### 3. Wind Farm's Cause of Action Seeking Damages for Breach of Contract

Defendant argues that Wind Farm failed to state a claim for breach of contract. See Docket No. 81 at pp. 23–25. Defendant states that, apart from an unreasonable interpretation of the subordination agreement, Wind Farm failed to specify the contractual obligations breached. Id. at p. 23. Defendant also argues that Wind Farm cannot state a claim for breach of contract because Plaintiffs, not Defendant, are responsible for the alleged damages. Id. at pp. 24–25.

Wind Farm has stated a plausible claim for breach of contract. Wind Farm alleges Defendant breached its obligations pursuant to both the provisions of the subordination agreement and the implied covenant of good faith and fair dealing in the land leases. (Docket No. 119 at pp. 26–27.) In support, Wind Farm alleges that Defendant demanded rent in an amount larger than that to which it was entitled by (i) seeking to collect sums related to

insurance proceeds that it knew or should have known were never paid and (ii) failing to take into account the subordination agreement.  See id. at pp. 26-27.  Wind Farm further alleges that Defendant unlawfully terminated the land leases based on those inflated sums.  Id.  And, as discussed above, Wind Farm's interpretation of the subordination agreement is plausible. Additionally, Wind Farm alleges that Defendant did not provide a fair opportunity to cure purported defaults.  Wind Farm also alleges that Defendant's action has caused damage, including by delaying rebuilding of the project.  These allegations are sufficient to state a plausible claim for relief and survive a motion to dismiss pursuant to Rule 12(b)(6).  Cf. Edlow v. RBW, LLC, 688 F.3d 26, 35-36 (1st Cir. 2012); González-Camacho v. Banco Popular de P.R., 318 F. Supp. 3d 461, 483 (D.P.R. 2018) (Domínguez, J.).

> **4.    Wind Farm's Cause of Action for Bad Faith (Dolo) in the Performance of Contractual Obligations**

Defendant's argument for dismissal here is merely a rehash of its alternative arguments for dismissal of Plaintiffs' desired declaratory relief.  See Docket No. 81 at pp. 25-26. Defendant tacks on the assertion that, in light of those arguments, its actions were not dolus.  Id. at p. 26.

"[C]ontractual dolo is a broad term that includes deceit, fraud, misrepresentation, undue influence and other insidious machinations." P.R. Tel. Co., 662 F.3d at 99 (internal quotation marks omitted). "[D]olo in the performance of obligations is equalized to bad faith." Id. (internal quotation marks omitted).

"Dolo can take two forms: (1) dolo in the formation of contracts, and (2) dolo in the performance of contractual obligations." Portugués-Santana v. Rekomdiv Int'l, 657 F.3d 56, 59 (1st Cir. 2011). "Dolus in the performance of a contractual obligation occurs where a party, knowingly and intentionally, through deceitful means, avoids complying with its contractual obligation." Casco, Inc. v. John Deere Constr. & Forestry Co., Civ. No. 13-1325, 2015 WL 4132278, at *2 (D.P.R. July 8, 2015) (Delgado-Hernández, J.).

Wind Farm has plausibly alleged a claim of dolus in the performance of contractual obligations. Defendant's efforts to collect rent from Wind Farm based on insurance proceeds run headlong into the allegations that no such insurance proceeds have been received, that Defendant did not initially disclose that the rent it was seeking was based on the insurance proceeds, and that Defendant's efforts occurred while it was affiliated with Wind Farm. See Docket No. 119 at pp. 13–14, 16–17. And, of course,

Defendant's argument for dismissal is a dud. It is built on the unavailing arguments the Court rejects above.

Wind Farm's other asserted basis for its dolo claim, however, is not plausible. Wind Farm alleges that Defendant set forth reasons for termination of the land leases as a subterfuge to recover amounts denied it by the subordination agreement, all while knowing it was carrying out an unfair act from which it intends to benefit. Id. at pp. 28-29. That is a conclusory allegation. Nowhere does Wind Farm allege well-pled facts supporting the proposition that Defendant is knowingly and intentionally avoiding compliance with the subordination agreement as a subterfuge. As such, the Court is unable to draw the reasonable inference that Defendant is liable for dolo on this basis. Zenón, 924 F.3d at 616; Ocasio-Hernández, 640 F.3d at 12.

### 5. Wind Farm's Causes of Action for Conversion and Restitution

Wind Farm argues that Defendant is liable to conversion and restitution on two theories. See Docket No. 119 at pp. 30-32. According to Wind Farm, Defendant intentionally caused Wind Farm to pay rents for the year 2017 that either were more than the amounts due or which Defendant had no right to collect pursuant to the subordination agreement. Id.

Defendant argues it has no liability to conversion and restitution. See Docket No. 81 at pp. 26-27. First, according to Defendant, the subordination agreement is irrelevant where there is no outstanding obligation pursuant to the facility lease. Id. at p. 26. Defendant further points out that Wind Farm does not allege that in 2017 there was any outstanding obligation pursuant to the facility lease. Id. Thus, Defendant argues, Wind Farm's claims for conversion and restitution based on rents collected by Defendant in 2017 are baseless. Id. at pp. 26-27.

The Court agrees with Defendant. On the question of whether the subordination agreement provides for clawing back Wind Farm's completed payments to Defendant because Wind Farm has obligations to Punta Lima that were not outstanding when the payments to Defendant were completed, the terms of the contract are clear and leave no doubt as to the intentions of the contracting parties. In re Advanced Cellular, 483 F.3d at 12. The subordination agreement does not so provide. It subordinates "payment obligations" to Defendant "in favor of any and all the obligations of [Wind Farm] owing to [Punta Lima]." Docket No. 119, Ex. 12 at p. 2 (emphasis added). A completed payment to Defendant would not seem to be an obligation, and the present tense verb "owing" implies that an obligation to Punta Lima should be existing at the time it is to have a subordinating effect. See id. And,

as Defendant points out, Wind Farm does not allege there were any outstanding obligations to Punta Lima in 2017.

Wind Farm's other theory for conversion and restitution rests on its allegation that excess payments were made in 2017. See Docket No. 119 at pp. 30-32. Wind Farm, however, offers no well-pled facts in support of this conclusory assertion. To the contrary, the table attached to Wind Farm's complaint (originally provided to Punta Lima by Defendant), see id., Ex. 26, indicates that the rents paid for 2017 were computed based on the project's actual revenues from January to August of that year. See id. While that table also includes a notation for the business interruption insurance proceeds that Plaintiffs allege have not been paid, the insurance proceeds affect the amounts still outstanding rather than the amounts paid. See id. Wind Farm's failure to allege well-pled facts leave the Court unable to draw the reasonable inference that Defendant is liable for restitution and conversion on this theory. Zenón, 924 F.3d at 616; Ocasio-Hernández, 640 F.3d at 12.

As such, Wind Farm has failed plausibly to allege facts in support of its claims for conversion and restitution. Consequently, these causes of action are **DISMISSED WITHOUT PREJUDICE.**

### 6.    Defendant's Request for Attorney Fees

Defendant argues that Plaintiffs have pursued a frivolous litigation. (Docket No. 81 at pp. 27-29; Docket No. 64 at pp. 30-32.) As such, Defendant argues, it is entitled to attorney fees.

Defendant's argument is without merit. As discussed at length above, Wind Farm's claims are plausible. The proceedings do not entitle Defendant to attorney fees. <u>Bernardi Ortiz v. Cybex Int'l, Inc.</u>, 345 F. Supp. 3d 107, 132-33 (D.P.R. 2018) (Delgado-Hernández, J.).

### 7.    Punta Lima's Deposit of Funds

Defendant devotes numerous pages of its dismissal motions to the question of whether Punta Lima properly deposited funds. <u>See</u> Docket No. 81 at pp. 19-21; Docket No. 64 at pp. 19-21. Even if the Court agreed with Defendant, however, the resolution of Defendant's motion to dismiss would be unchanged. There is, therefore, no current reason to consider this issue.

## III. Consolidation of Hearing on Preliminary Injunctions with Trial on Merits of Plaintiffs' Causes of Action

Hearings are not required pursuant to every motion for a preliminary injunction. <u>See</u> <u>Rosario-Urdaz v. Rivera-Hernández</u>, 350 F.3d 219, 223 (1st Cir. 2003). Still, "evidentiary hearings are often desirable at the preliminary injunction stage" and

"[i]f . . . 'the question is close and time permits, then doubt should be resolved in favor of taking evidence.'" Id. (quoting Aoude v. Mobil Oil Corp., 862 F.2d 890, 894 (1st Cir. 1988)).

The Court believes that the motions in Docket Nos. 9, 12, and 58 should be resolved after an evidentiary hearing. Therefore, the Court **ORDERS** an evidentiary hearing for January 24, 2020 at 9:00 a.m.

A court may consolidate the preliminary injunction hearing with a bench trial on the merits of the pending claims. Fed. R. Civ. P. 65(a)(2); Lamex Foods, Inc. v. Audeliz Lebrón Corp., 646 F.3d 100, 106-07 (1st Cir. 2011). In this case, no party has requested that a jury resolve the merits of their claims. See Docket Nos. 119, 120. The Court therefore provides notice that the evidentiary hearing on January 24, 2020 will be consolidated with a bench trial on the merits of the claims.

## IV. Conclusion

Defendant's motion to dismiss Punta Lima's complaint, (Docket No. 64,) is **DENIED**. Defendant's motion to dismiss Wind Farm's complaint, (Docket No. 81,) is **GRANTED IN PART AND DENIED IN PART**. Wind Farm's claims for conversion and restitution, (Docket No. 119 at pp. 30-32,) are **DISMISSED WITHOUT PREJUDICE**. The Court **ORDERS** an **evidentiary hearing on January 24, 2020 at 9:00 a.m.** concerning the requests for preliminary injunctive relief. (Docket Nos. 9,

12, 58.)  A trial on the merits of the remaining causes of action in the two complaints, (Docket Nos. 119, 120,) will be consolidated with that hearing.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, November 27, 2019.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE