PUNTA LIMA, LLC,

    **Plaintiff**,

              **v.**

PUNTA LIMA DEVELOPMENT COMPANY, LLC,

    **Defendant**.

**Civil No.** 19-1673 (FAB)

PUNTA LIMA WIND FARM, LLC,

    **Plaintiff**,

              **v.**

PUNTA LIMA DEVELOPMENT COMPANY, LLC,

    **Defendant**.

**Civil No.** 19-1800 (FAB)

**OPINION AND ORDER**

BESOSA, District Judge.

    Forasmuch as these cases originate with Hurricane María, the cases themselves have become like tempests. The Court's November opinion, <u>Punta Lima, LLC v. Punta Lima Dev. Co., LLC</u>, 2019 WL 6358215 (D.P.R. Nov. 27, 2019) (Besosa, J.), was followed by seven amended counterclaims against each plaintiff, <u>see</u> Docket Nos. 130, 131, 177, 178, a motion to dismiss some of those amended counterclaims, <u>see</u> Docket No. 180, a discovery dispute, <u>see</u> Docket No. 139, and a raft of scheduling squabbles, <u>see</u> Docket Nos. 136,

151, 168.  "[W]hat's past is prologue," it seems, in this turbulent
litigation.  William Shakespeare, The Tempest act 2, sc. 1.

As discussed below, the motion to dismiss filed by Punta Lima,
LLC ("Punta Lima") and Punta Lima Wind Farm, LLC ("Wind Farm," and
together with Punta Lima, "plaintiffs"), see Docket No. 180 is
**GRANTED IN PART AND DENIED IN PART.**  That part of the motion
pertaining to the amended fifth counterclaim remains pending.
Plaintiffs' first motion to dismiss, see Docket No. 148, is **VACATED
AS MOOT.**  Punta Lima Development Company, LLC ("defendant")'s
amended first counterclaims against each plaintiff, see Docket
No. 177 at pp. 14-17; Docket No. 178 at pp. 16-19, are **DISMISSED
WITH PREJUDICE.**  Defendant's amended fifth counterclaims, see
Docket No. 177 at pp. 22-24; Docket No. 178 at pp. 24-26, are
bifurcated from the trial on the other claims and counterclaims in
these cases.  Defendant's amended sixth counterclaims, see Docket
No. 177 at pp. 24-25; Docket No. 178 at pp. 26-27, are **DISMISSED
WITH PREJUDICE IN PART**.  Defendant's amended seventh counterclaim
against Wind Farm, see Docket No. 177 at pp. 25-31, is not
dismissed, while the amended seventh counterclaim against Punta
Lima; see Docket No. 178 at pp. 27-33, is **DISMISSED WITH PREJUDICE.**

Other pending motions are also resolved below.  Plaintiffs'
motion regarding claims to be heard at trial, see Docket No. 136,

is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs' motion to continue the hearing and trial, see Docket No. 151, is **DENIED**.

## I.  Background

### A.  Factual Background

The Court's November opinion in these cases detailed the factual allegations in plaintiffs' complaints. See Punta Lima, 2019 WL 6358215, at *1-6. Defendant has since answered those allegations. See Docket No. 130 at pp. 1-23; Docket No. 131 at pp. 1-9. Many of the facts alleged by plaintiffs are admitted and adopted by defendant. See Docket Nos. 130, 131.

In this opinion, the Court relies on the factual allegations in defendant's amended counterclaims and the materials attached to them or incorporated in them. Docket Nos. 177, 178; see also Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009) (explaining that, except for a certain narrow class of documents, Federal Rule of Civil Procedure 12(b)(6) permits a court to consider only facts and documents that are part of or incorporated into a complaint). This opinion does not present defendant's complete counternarrative. Rather, the Court generally focuses on defendant's factual allegations relevant to resolution of plaintiffs' pending motion to dismiss. The Court "take[s] as true the allegations of the [amended counterclaims], as well as any inferences [the Court] can draw from [them] in the

[counterclaimant's] favor."  Zenón v. Guzmán, 924 F.3d 611, 615 (1st Cir. 2019); see Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 174–75 (1965).

### 1.  Basic Description of the Parties' Relationship

Wind Farm and defendant used to be affiliates.  See Docket No. 177 at p. 3; Docket No. 178 at p. 3.  That relationship changed hours before the first complaint in this judicial proceeding was filed on July 15, 2019.  See Docket No. 177 at p. 3; Docket No. 178 at p. 3.  Since July 15, Punta Lima has owned the membership interest in Wind Farm.  See Docket No. 177 at p. 3; Docket No. 178 at p. 3.

### 2.  Land Leases and Related Agreements

Around late 2012, defendant and Wind Farm entered a suite of agreements by which defendant leased or subleased land to Wind Farm.  See Docket No. 177 at p. 7; Docket No. 178 at p. 7. The agreements are collectively referred to in this opinion as the "land leases."  The land is described in this opinion as the "project site" because a wind-powered electric generation project is located on the land.  See Docket No. 17 at pp. 2, 7; Docket No. 178 at pp. 2, 7.  The electric generation project is described in this opinion as the "project."

Some agreements give rights to Punta Lima.  For instance, if Wind Farm defaults in its land leases rental

obligations, Punta Lima has the right, but not the obligation, to cure the default.  See Docket No. 177 at p. 7; Docket No. 178 at pp. 7-8.

Wind Farm and defendant also entered an operation and management service agreement to perform routine administrative services associated with the project.  See Docket No. 177 at p. 13; Docket No. 178 at p. 15.  That agreement is referred to in this opinion as the "O&M agreement."  The O&M agreement is designed to last as long as an agreement between Wind Farm and another entity. See Docket No. 177 at p. 13; Docket No. 178 at p. 15.

### 3.  Facility Lease

Also in 2012, Wind Farm leased from Punta Lima wind-powered electric generation equipment and related material.  See Docket No. 177 at p. 8; Docket No. 178 at p. 8.  That agreement is referred to in this opinion as the "facility lease."

The facility lease addresses destruction of the project.  See Docket No. 177 at p. 8; Docket No. 178 at pp. 8-9. If the project is destroyed, Wind Farm can choose either to rebuild the project or to terminate the facility lease.  See Docket No. 177 at p. 8; Docket No. 178 at pp. 8-9.  The facility lease requires Wind Farm to choose to rebuild or terminate within four months of the destructive incident, or be deemed to have elected to terminate the agreement.  See Docket No. 177 at p. 8; Docket No. 178 at

pp. 8-9.  In the event of termination, Wind Farm owes Punta Lima a sum referred to here as the "termination payment."  See Docket No. 120, Ex. 8 at p. 24 (cited at Docket No. 178 at p. 9); see also Docket No. 177 at pp. 3-4, 29-30 (discussing termination payment); Docket No. 178 at pp. 3-4, 31-32 (same).

Another agreement granted Punta Lima the right to foreclose on the membership interest in Wind Farm should the latter default in its facility lease obligations.  See Docket No. 177 at p. 8; Docket No. 178 at pp. 9.  Pursuant to this agreement, defendant states, "the delivery of the Collateral 'secures the payment and performance when due of all Obligations.'"  See Docket No. 188 at p. 8 (quoting agreement); Docket No. 178 at p. 9 (same).

### 4. Subordination Agreement

Defendant and Wind Farm also executed a subordination agreement.  See Docket No. 177 at pp. 2-3; Docket No. 178 at pp. 2-3.  This agreement is denominated the "subordination agreement" in this opinion.  Pursuant to the subordination agreement, defendant agreed to subordinate most of Wind Farm's payment obligations to defendant in favor of Wind Farm's obligations to Punta Lima.  See Docket No. 177 at pp. 2-3; Docket No. 178 at p. 2-3.

### 5.    Project Operation and Destruction

Hurricane María destroyed the project on September 20, 2017.  See Docket No. 177 at p. 8; Docket No. 178 at p. 10.  Before then, the project was successfully operated.  See Docket No. 177 at p. 8; Docket No. 178 at p. 10.

### 6.    Negotiations After Destruction of the Project

After the hurricane passed, the parties and their parent companies began negotiations to rebuild the project.  See Docket No. 177 at p. 9; Docket No. 178 at p. 11.

In 2018 and 2019, Punta Lima agreed to extend the time in which Wind Farm was required to decide whether to rebuild the project or terminate the facility lease.  See Docket No. 177 at p. 9; Docket No. 178 at p. 11.  These agreements are referred to in this opinion as the "extension agreements."  The extension agreements provided that Wind Farm would continue payments due pursuant to the facility lease but would not spend insurance proceeds on, for instance, land leases rent.  See Docket No. 177 at pp. 9-10, 27; Docket No. 178 at pp. 11-12, 29; see, e.g., Docket No. 119, Ex. 19 at pp. 2-3 (cited or referenced in Docket Nos. 177, 178) (stating terms of extension agreement).

The negotiations were eventually halted.  See Docket No. 177 at p. 10; Docket No. 178 at pp. 11-12.  Punta Lima was opposed to sharing the costs of revenue reductions proposed by

the Puerto Rico Electric Power Authority ("PREPA"). See Docket
No. 177 at p. 10; Docket No. 178 at pp. 11-12. PREPA is the entity
purchasing electric power from the project. See Docket No. 177 at
p. 8; Docket No. 178 at p. 9. The negotiations were also halted
because of Punta Lima's approach to a proposed joint venture
interest distribution. See Docket No. 177 at p. 10; Docket No. 178
at p. 11-12. As a result, defendant was unable to begin
reconstruction efforts. See Docket No. 177 at p. 10; Docket
No. 178 at p. 12.

### 7. Wind Farm Defaults on Land Leases

On May 9 and 31, 2019, defendant informed Wind Farm
of defaults pursuant to the land leases. See Docket No. 177 at
p. 10; Docket No. 178 at p. 12. At this time, defendant states,
Wind Farm had not defaulted in its rent payments pursuant to the
facility lease. See Docket No. 177 at p. 10; Docket No. 178 at
p. 12.

Additionally, in late June, 2019, defendant sent
Punta Lima notices of Wind Farm's default. See Docket No. 177 at
p. 10; Docket No. 178 at p. 12. In those notices, defendant
granted Punta Lima thirty days to cure Wind Farm's default. See
Docket No. 177 at p. 10; Docket No. 178 at p. 12. By this time in
late June, as further described below, Punta Lima had already

acquired control over Wind Farm. <u>See</u> Docket No. 177 at p. 10;

Docket No. 178 at p. 12.

### 8. Wind Farm Defaults on Facility Lease

On June 21, 2019, Punta Lima notified Wind Farm of

the occurrence of default pursuant to the facility lease and

demanded immediate payment. <u>See</u> Docket No. 177 at p. 11; Docket

No. 178 at p. 13. The only event of default identified in the

notice was PREPA's bankruptcy. <u>See</u> Docket No. 177 at p. 11; Docket

No. 178 at p. 13. In addition, through this letter, Punta Lima

invoked its right to exercise the membership interest powers in

Wind Farm. <u>See</u> Docket No. 177 at p. 11; Docket No. 178 at p. 13.

Defendant was thereafter unable to exercise a membership interest

over Wind Farm, including a right to vote over Wind Farm's

decisions. <u>See</u> Docket No. 177 at p. 11; Docket No. 178 at p. 13.

After Punta Lima took control of Wind Farm, the

latter failed for the first time to make a rent payment pursuant

to the facility lease. <u>See</u> Docket No. 177 at p. 11; Docket No. 178

at p. 13. According to defendant, this was done "to ensure that

[Punta Lima] could then foreclose on [Wind Farm] and terminate the

[facility lease]." <u>See</u> Docket No. 177 at p. 11; Docket No. 178 at

p. 13.

### 9.   Punta Lima Acquires Wind Farm

By an agreement effective on the morning of July 15, 2019, Punta Lima took ownership of Wind Farm. See Docket No. 177 at pp. 11–12; Docket No. 178 at p. 13. This agreement is described in this opinion as the "foreclosure sale agreement." The foreclosure sale agreement provides that the purchase price for the Wind Farm membership interests is $18,944,097.00, and that amount would be payment for Wind Farm's obligations to Punta Lima pursuant to the facility lease. See Docket No. 120, Ex. 12 at p. 2 (cited by Docket No. 177 at pp. 11–12; Docket No. 178 at p. 13). The foreclosure sale agreement does not provide a basis for the purchase price calculation, but the amount is similar to the insurance proceeds Wind Farm received by January 2019. See Docket No. 177 at p. 12; Docket No. 178 at p. 14.

At the same time, Punta Lima and Wind Farm also agreed to terminate the facility lease. See Docket No. 177 at p. 12; Docket No. 178 at p. 14. This agreement is described in this opinion as the "facility lease termination agreement."

Four days later, on July 19, 2019, the parties to the foreclosure sale agreement entered into an amended agreement. See Docket No. 177 at pp. 12–13; Docket No. 178 at pp. 14–15. This agreement is described in this opinion as the "amended foreclosure sale agreement." The amended foreclosure sale agreement states

that the purchase price for the Wind Farm membership interests constitutes partial payment for Wind Farm's obligations to Punta Lima. Docket No. 119, Ex. 30 at p. 2; see Docket No. 177 at pp. 12-13 (discussing the amended foreclosure sale agreement); Docket No. 178 at pp. 14-15 (same). According to defendant, plaintiffs agreed to the amended foreclosure sale agreement "seeking to unlawfully revive Plaintiff's extinguished debts, to prevent [defendant] from collecting rent" by way of the subordination agreement. See Docket No. 177 at p. 13; Docket No. 178 at p. 15.

### 10. Defendant Terminates the Land Leases

On July 27, defendant sent to plaintiffs notifications that it was terminating the land leases. See Docket No. 177 at p. 11; Docket No. 178 at p. 12. Defendant gave Wind Farm ninety days to remove its possessions. Docket No. 119, Ex. 33 at p. 1 (cited at Docket No. 177 at p. 11; Docket No. 178 at p. 12).

### 11. Wind Farm Terminates the O&M Agreement

Wind Farm terminated the O&M agreement in September 2019. See Docket No. 177 at p. 13; Docket No. 178 at p. 15. This termination was based on an alleged termination of the agreement whose term is coincident with the term of the O&M agreement. See Docket No. 177 at p. 13; Docket No. 178 at p. 15. The termination

of the other agreement, however, did not occur pursuant to necessary notice procedures in that agreement. See Docket No. 177 at pp. 13-14; Docket No. 178 at p. 15-16.

**B.    Procedural Background**

The procedural background to this case is elaborated at length in the Court's prior opinions. See Punta Lima, 2019 WL 6358215, at *6-7; Docket No. 162 at pp. 2-6. The procedural background discussed below focuses only on the matters relevant to the pending motions.

Defendant asserted seven counterclaims against both Punta Lima and Wind Farm. See Docket No. 130 at pp. 39-56; Docket No. 131 at pp. 27-43. Plaintiffs moved to dismiss the first, fifth, sixth, and seventh counterclaims against each of them. See Docket No. 148 at p. 2. Defendant then amended its counterclaims. See Docket Nos. 177, 178. The amended counterclaims make substantive changes to the fifth counterclaims against each plaintiff. See Docket No. 177 at p. 1 n.1; Docket No. 178 at p. 1 n.1. Plaintiffs then moved to dismiss the amended counterclaims, incorporating by reference their earlier arguments with respect to the first, sixth, and seventh counterclaims and making new

arguments with respect to the changed fifth counterclaims.  See

Docket No. 180 at pp. 1–2.[1]

The parties also filed other motions.  Plaintiffs moved

bifurcate the trial on some or all of defendant's counterclaims

from the preliminary injunction hearing and trial on their claims

and their requests for preliminary and permanent injunctions.  See

Docket No. 136 at pp. 1–2.  Plaintiffs separately moved to continue

the hearing and trial date.  See Docket No. 151 at p. 1.  Defendant

moved for subpoenas and a discovery request.  See Docket No. 139

at p. 7.

## II.  Standard of Review

Rule 12(b)(6) permits a defendant to move to dismiss an action

for failure to state a claim upon which relief can be granted.

Fed. R. Civ. P. 12(b)(6).  To survive the motion, "a complaint

must contain sufficient factual matter, accepted as true, to 'state

a claim to relief that is plausible on its face.'"  Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible

if, after accepting as true all non-conclusory factual

allegations, the court can draw the reasonable inference that the

defendant is liable for the misconduct alleged.  Ocasio-Hernández

---

[1] All references below to plaintiffs' motion to dismiss in Docket No. 148 should
be understood as applicable to defendant's amended counterclaims because Docket
No. 148 is incorporated by reference in Docket No. 180.

v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [a court] to draw on [its] judicial experience and common sense."  Zenón, 924 F.3d at 616 (internal quotation marks omitted).  A court must decide whether the complaint alleges sufficient facts to "raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  The burden is on the plaintiff to allege a viable cause of action plausibly.  Hochendoner v. Genzyme Corp., 823 F.3d 724, 730 (1st Cir. 2016).

Assessing the adequacy of a complaint in the First Circuit involves two steps.  Zenón, 924 F.3d at 615–16.  First, a court "isolate[s] and ignore[s] statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements."  Id. at 615 (internal quotation marks omitted).  Second, the court "take[s] the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor" to "see if they plausibly narrate a claim for relief."  Id. at 615–16 (internal quotation marks omitted).

## III. Discussion

### A.   Defendant's Amended First Counterclaims

#### 1.   The Parties' Positions

In its amended first counterclaim, defendant asks for a declaratory judgment that the amended foreclosure sale agreement is null and void.  See Docket No. 177 at pp. 14-17; Docket No. 178 at pp. 16-19.  According to defendant, the amended foreclosure sale agreement is null and void because it is a contract prejudicing a third party as defined in Dennis v. City Federal Savings & Loan Association, 21 P.R. Offic. Trans. 186, 202 (1988).  See Docket No. 177 at pp. 14-17; Docket No. 178 at pp. 16-19.

Plaintiffs argue that defendant has not pled facts sufficient to state a cause of action pursuant to Dennis.  See Docket No. 148 at pp. 8-19.  Plaintiffs argue that defendant's interests are not among those protected by Dennis, including because defendant freely consented to subordinate its interests through the subordination agreement.  Id. at pp. 10-12. Plaintiffs also argue that defendant failed sufficiently to allege causation and intent to harm, two elements of a Dennis claim.  Id. at pp. 13-18.  Plaintiffs stipulate that Puerto Rico law applies for purposes of their motion to dismiss, but ask that they be allowed

to brief a conflict of laws issue should the Court deny their motion. Id. at p. 19.

Defendant responds to some of plaintiffs' arguments. See Docket No. 171 at pp. 3-13. Defendant devotes much of its response to arguments about the proper standard of review applied to motions to dismiss. Id. at pp. 2-3, 8-11. At various points, defendant (erroneously) tells the Court that "[t]he correct standard" is found in a decision predating Iqbal and Twombly by more than a half-century, id. at p. 9 (quoting Manosky v. Bethlehem-Hingham Shipyard, Inc., 177 F.2d 529, 531 (1st Cir. 1949)), and that "[u]nder the applicable pleading standards, all that is required is that [defendant] put Plaintiffs on notice of its case and state how the alleged wrongdoing caused it harm," id. at p. 10-11.[2]  Defendant additionally recounts a litany of facts that, according to defendant, satisfy its burden to plead at this stage of the proceeding. Id. at pp. 5-8, 11-12. With respect to its pleading of injury, defendant relies on cases adjudicating the issue of standing and avers that, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on this stage, courts

---

[2] Defendant asked for, and the Court granted, an extension to file its response to plaintiffs' motion to dismiss because "[d]espite [its] best efforts," defendant required an extension "to submit a properly vetted version of its brief." See Docket No. 164 at p. 2; Docket No. 166.

presume that general allegations embrace those specific facts that are necessary to support the claim." Id. at p. 10. Defendant does not otherwise respond to plaintiffs' argument that its consent to the subordination agreement renders its interests and injury unprotected by Dennis. See id.

### 2. Applicable Law

Puerto Rico has adopted a treatise author's explanation that "in all cases in which both contracting parties arrange to cause harm to a third person, the contract has an illegal consideration, and such condition thus implies its nullity." Dennis, 21 P.R. Offic. Trans. at 206 (internal quotation marks omitted). The aggrieved third person can seek to nullify the contract. Id. The doctrine "is related and analogous to the tortious interference with a contractual relation." Id. at 200; see Gen. Office Prods. Corp. v. A.M. Capen's Sons, Inc., 15 P.R. Offic. Trans. 727, 734 (1984).

There are four necessary elements to a contract prejudicing a third party. Dennis, 21 P.R. Offic. Trans. at 202. These are: "(1) that a third person has been affected; (2) that said third person has sustained injury; (3) that a causal nexus exists between the injury and the contract; and (4) that there is intent to cause injury, either by both contracting parties or by only one of them." Id.

To withstand a motion to dismiss, a claimant alleging a contract prejudicing a third party must plead facts that, if proven, would satisfy each of the four elements of the Dennis test.  See, e.g., Triangle Cayman Asset Co. 2 v. Prop. Rental & Inv., Corp., 278 F. Supp. 3d 508, 519 (D.P.R. 2017) (Besosa, J.).  As with any claim, "bare, conclusory allegations are insufficient to withstand a motion to dismiss pursuant to Rule 12(b)(6)."  Id.

### i. Commonwealth and Federal Cases Expounding and Applying the Four Elements in the Dennis Test

### a. Whether a Third Person Is Affected

The first element in the Dennis test requires the third person both to (i) be a stranger to the contract and (ii) "be tied to the parties or to one of them by a juridical relation harmed by the same, or is dependent on the tortious cause and effect contract."  Dennis, 21 P.R. Offic. Trans. at 202 (internal quotation marks omitted).  "Essential to this situation," the Puerto Rico Supreme Court further explained, "is the incompatibility between the juridical position of the injured third persons and the effects derived from the contract."  Id.

In Dennis, a party held an option to purchase property and a right of first refusal vis-à-vis offers from any other interested buyers.  Id. at 192.  While that option

remained in effect, the property was sold to another buyer.  Id.
The Dennis court said the first element of the Dennis test was
satisfied in these circumstances because the option holder's
position was "radically incompatible with," and injured by, the
sale of the property.  Id. at 202–03.

        **b.**    **Whether the Third Person Sustained Injury**

        The second element requires "a harm
caused by said contract to the third person."  Id. at 203.  This
requirement is demanding because it is only satisfied by certain
types of harm.

        To satisfy the injury requirement, a
third party must show harm to its rights.  The Dennis court
observed that, according to a Spanish treatise, "[a]n injury is a
harm or a violation of a concrete subjective right, hence no injury
is caused to third persons if the interests at stake are not
specially protected interests."  Id. (alteration in original)
(internal quotation marks omitted).  Another treatise, the Dennis
court noted, "indicates that the injury is the undermining or
withdrawal of a legal interest . . . injury to a statutory
interest."  Id. (alteration in original) (internal quotation marks
omitted).  The Dennis court also quoted a treatise as follows:

> The problem with these contracts stems primarily from a
> violation of a subjective credit right of a third person
> who is harmed by such violation.  The duty to respect
> other parties' legal situations (obligatory or real) is
> accepted without question by the doctrine and case law,
> and, clearly, the possibility that a contract is
> prejudicial to the same is seen when one of the
> contracting parties is subject to such credit right (the
> exclusive distributor harmed because the person that
> gave him the sales exclusive is selling to others within
> the restricted area).

Id.

Three cases help elucidate the injury requirement.  In Dennis, the sale contract affected the third party's "'personal' or 'credit' right' . . . constituted by the option to buy."  Id. at 203.  Having "transgressed" that right, the sale contract "eliminated the exclusive reserve of the right to buy [the property], which was the object of the option."  Id. at 204 (internal quotation marks omitted).

Three years later, in Dolphin International of Puerto Rico, Inc. v. Ryder Truck Lines, Inc., 127 D.P.R. 869 (1991) (officially translated to English),[3] the court held the requirement unsatisfied.  In that case, a Florida business began a commercial relationship with a Puerto Rico business by which the latter would act as agent for the former.  Id.  When the

---

[3] "The official translations of many Puerto Rico cases . . . do not contain internal page numbers.  Accordingly, [courts] cannot include pin-point citation references for those cases."  Citibank Glob. Mkts., Inc. v. Rodríguez-Santana, 573 F.3d 17, 24 n.7 (1st Cir. 2009).

Florida business terminated the relationship six months later, it

hired some of the Puerto Rico business's employees.  Id.

                In a terse footnote, the Dolphin court

held the Florida business's contractual relation with the

employees insufficient to ground a Dennis action.  Id. at n.11.

The Puerto Rico business's interests were not specially protected,

the Dolphin court suggested, because there was no injury to any of

its rights.  Id.  The court explained:

> The [employees] in the case at bar, could resign from
> their jobs with [the Puerto Rico business] at any time
> and for any reason.  [The Puerto Rico business] had no
> right to require its employees to stay with the company.
> Therefore, the agreed labor relation between [the
> Florida business] and the employees did not harm any of
> [the Puerto Rico business's] rights.  Once it has been
> established that no damage was caused, we need not
> analyze the remaining requirements.

Id.

                Dolphin thus teaches that a third party

must identify a right infringed by contracting parties.  It is not

hard to imagine myriad ways that the employees' contract with a

competitor might have harmed the Puerto Rico business.  Indeed,

the Puerto Rico business alleged that its "business would come to

a virtual stop" without the lost employees and a lower court found

the business was damaged.  127 D.P.R. 869.  But if the third party

does not hold a certain type of right injured by the agreement—

like the option contract in Dennis impaired by the property sale—

those harms will not suffice to satisfy the second element of the

Dennis test.   Id. at n.11.

Dolphin does not expressly identify the

type of right that must be infringed.   See id.  This issue, along

with the larger question of why the Puerto Rico Supreme Court

requires infringement of a right, is discussed below.

The third case elucidating the injury

element to the Dennis test is Twin County Grocers, Inc. v. Méndez

& Co., Inc., 81 F. Supp. 2d 276, 292 (D.P.R. 1999) (Domínguez,

J.).  In this case, a party argued that a contractual arrangement

damaged its exclusive and/or sole distribution rights.   Id.  The

Twin County Grocers court explained that, pursuant to Dennis,

"[t]here is no injury if the third party is merely placed in a[n]

unfavorable position or interferes with interests not specifically

protected."  Id.  The Twin County Grocers court held that the third

party was not entitled to summary judgment because doubts as to

the professed exclusivity rights prevented it from "satisfy[ing]

the 'damage to the third party' requirement."   Id.

        c.     **Whether There Is a Causal Nexus Between
               a Contract and the Third Person's Injury**

The third element in the Dennis test—a

causal nexus between the contract and injury—requires "[t]he

injury . . . be the direct and immediate result of the contract."

Dennis, 21 P.R. Offic. Trans. at 204. This requirement was satisfied in Dennis because "the impossibility of executing the option . . . and the possible damages stemming from that breach, were the direct and immediate result of the sale contract." Id.

### d.    Whether There Is Intent to Harm

The final element requires "an intent to cause harm either by one or both parties." Id. (internal quotation marks omitted). After noting disagreement among treatise authors as to liability for a lack of due diligence concerning affected third parties, the Dennis court concluded that "the prejudiced party need only show or present facts allowing . . . [the Court] to infer that . . . [the injurers have] acted tortiously, with knowledge of the contract's existence, or the third person's artificial relation." Id. at 204–05 (first and third alterations in original) (internal quotation marks omitted). The Dennis court found that, because the parties to the property sale knew of the option contract, they intended to cause harm." Id. at 205.

### e.    Synthesis

In summary, the Dennis test requires (i) a third person to have a juridical relation harmed by the questioned contract, (ii) that harm must be to a specially protected interest, (iii) the harm must be the direct and immediate result of the contract, and (iv) the contracting parties must

intend to harm that the third person's interests and know of those interests.

As is evident, judicial precedent elaborating the Dennis test is limited. This Court was not able to identify, and the parties did not provide, any other English-language decisions from the Puerto Rico Supreme Court addressing the Dennis test.

The limited precedent discussed above seems to raise as many questions as it answers. Why did the Dennis and Dolphin courts require injury to a third party's rights? What type of rights must be injured? Separately, what does it mean for an injured person's juridical relationship to be incompatible with an allegedly harmful contract? It is also unclear what type of causation is meant by "direct and immediate." If a contract is a but-for cause of harm but would not cause that harm without a separate agreement to which the injured party acceded, does the contract satisfy the causation element of the Dennis test? And, while the Dennis court found the intent-to-harm element satisfied because the parties knew that the third party would be harmed, is more evidence sometimes required to allow a court to infer intent to harm?

To understand these unresolved issues better, the Court considers the functional, economic, and

historical aspects of the <u>Dennis</u> doctrine.  The broader perspective facilitates application of the <u>Dennis</u> doctrine here.

### ii.  The <u>Dennis</u> Doctrine in a Broader Context

It is sometimes said that, "[i]n the law of contracts . . . much depends on the maxim '*pacta tertiis nec nocent nec prosunt*':  covenants between two parties neither hurt nor benefit third parties."  Daniela Caruso, <u>Non-Parties: The Negative Externalities of Regional Trade Agreements in a Private Law Perspective</u>, 59 Harv. Int'l L.J. 389, 389 (2018) [hereinafter Caruso].  Another Latin phrase, *res inter alios acta*, refers to "[t]he common-law doctrine holding that a contract cannot unfavorably affect the rights of someone who is not a party to the contract."  *Res Inter Alios Acta*, Black's Law Dictionary (11th ed. 2019).  These statements simply do not describe most contracts in our complex society.

Third parties are affected by contracts in various ways.  Supply and demand, and the attendant price signals, mean that a commercial contract is likely to affect other competitors in the same market.  Aditi Bagchi, <u>Other People's Contracts</u>, 32 Yale J. on Reg. 211, 217 (2015) [hereinafter Bagchi, <u>Other People's Contracts</u>]; Caruso, 59 Harv. Int'l L.J. at 390.  That same contract could also affect one of the parties' suppliers

or customers.  Bagchi, <u>Other People's Contracts</u>, 32 Yale J. on Reg. at 217.  Other examples abound.

In broad terms, externalities occur where a person incurs a cost or benefit that is created by others.  <u>See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs</u>, 531 U.S. 159, 195-96 (2001) (Stevens, J., dissenting); Richard L. Revesz, <u>Federalism and Interstate Environmental Externalities</u>, 144 U. Pa. L. Rev. 2341, 2343 (1996).  A contract that harms a third party causes a negative externality.

Contractual negative externalities are recognized as justifications for regulatory and judicial intervention.  "There are two standard reasons for legal intervention in contracts: asymmetric information and externalities."  Steven Shavell, <u>Contractual Holdup and Legal Intervention</u>, 36 J. Legal Stud. 325, 346 (2007).  "The presumption of contract enforceability is rebuttable where the contract . . . materially impinges on the rights of third parties (material externalities)."  Steven L. Schwarcz, <u>Intermediary Risk in a Global Economy</u>, 50 Duke L.J. 1541, 1578 (2001).

The <u>Dennis</u> doctrine is part of a rich vein of contract law that regulates contracts causing negative externalities.  Jewish law has regulated such contracts for millennia.  <u>See</u> Benjamin Porat, <u>Contracts to the Detriment of a</u>

Third Party: Developing a Model Inspired by Jewish Law, 62 Univ.

Toronto L.J. 347, 363 (2012).  Under the common law, "[i]n general,

a bargain which contemplates a wrong to a third person . . . is

illegal."  7 Richard A. Lord, Williston on Contracts § 16:14, at

477 (4th ed. 2010) [hereinafter Williston on Contracts].  The First

Circuit Court of Appeals, for instance, refused to apply the

fiction of retroactivity to the detriment of third parties while

distinguishing cases in which a retroactive amendment was made to

a prior agreement.  Debreceni v. Outlet Co., 784 F.2d 13, 19-20

(1st Cir. 1986).  Contracts harming third parties have also been

found void as contravening public policy.  See, e.g., Roddy-Eden

v. Berle, 108 N.Y.S.2d 597, 599-600 (N.Y. Sup. Ct. 1951).  Even

the Lochner Court, which promoted freedom of contract with little

interference by the state, "retained for the courts a substantial

role in reviewing agreements that might in some way cause harm to

third parties and that offended libertarian norms of notice and

consent."  G. Richard Shell, Contracts in the Modern Supreme Court,

81 Calif. L. Rev. 431, 527 (1993).

          Other areas of law also regulate contracts

causing harm to third parties.  These areas include the law on

unfair competition and antitrust.  See Caruso, 59 Harv. Int'l L.J.

at 409-11.

Not all contracts harming third parties, however, can realistically be outlawed. In a complex society, much of what is done harms others; if persons in a complex society were unable to reach agreements that adversely affect others, they could hardly transact at all. See Bagchi, Other People's Contracts, 32 Yale J. on Reg. at 212. And "[m]arket integration accelerates externalities because there is direct competition across a larger set of exchanges, requiring parties to respond to terms offered elsewhere in that set." Aditi Bagchi, Interpreting Contracts in a Regulatory State, 54 Univ. S.F. L. Rev. 35, 48 (2019) [hereinafter Bagchi, Interpreting Contracts].

Additionally, regulating a contract harming third parties presents a tension with notions of party autonomy and freedom of contract.

> A liberal state like ours is committed both to regulating the market to promote justice and protect people from harm as well as maximizing our sphere of autonomy in private affairs. . . . Every incursion into a private transaction that is intended to promote systemic goals or protect third parties has the effect of narrowing the scope of individual choice in contracting.

Id. at 39-40. Justice Holmes announced a view on this tension, stating that while a businessperson may set up shop in a small town and thereby ruin another's business, "the doctrine generally has been accepted that free competition is worth more to society than it costs, and that on this ground the infliction of the damage

is privileged." <u>Vegelahn v. Guntner</u>, 167 Mass. 92, 106 (1896)

(Holmes, C.J., dissenting).

         The upshot is that party autonomy, freedom of

contract, and protection of third parties are all bounded concepts.

<u>See</u> Daniel Markovits, <u>Contract Law and Legal Methods</u> 1550 (2012).

As one author puts it,

> While it is obvious that a contract should not be
> enforced where it is designed with the express purpose
> of harming third parties, it is less obvious to what
> extent contracting parties may incidentally undermine
> the value of third-party entitlements.  We might be
> tempted to say that parties to contract have no moral
> right to harm the interests of others.  But this would
> be unduly restrictive; a regime that disallowed any
> conduct, whether individual or joint, that adversely
> affects others would leave an intolerably small space
> for individual freedom.  Individuals have a strong
> interest in being permitted to burden others to some
> extent, but limiting that burden is among the legitimate
> functions of contract regulation.

Bagchi, <u>Interpreting Contracts</u>, 54 Univ. S.F. L. Rev. at 51.

         The limits on autonomy and freedom to contract

are manifested in <u>Dennis</u>, of course, because the doctrine protects

third parties at the expense of autonomy.  Other parts of Puerto

Rico law reflect a similar consideration.  For instance,

"contracting parties may make the agreement and establish the

clauses and conditions which they may deem advisable, provided

they are not in contravention of law, morals, or public order."

P.R. Laws Ann. tit. 31, § 3372.

The _Dennis_ limitation on freedom to contract
is a noteworthy aspect of Puerto Rico law.  "As it is known, the
freedom of contract principle governs in Puerto Rico." _Soc. de_
_Gananciales v. Vélez & Assocs._, 145 D.P.R. 508 (1998) (officially
translated to English without page numbers).

Yet the _Dennis_ doctrine does not always
privilege third parties.  The Puerto Rico Supreme Court intends
the _Dennis_ doctrine to strike a balance between promoting autonomy
and protecting third parties.

The Puerto Rico Supreme Court's balanced
approach is seen in _Dolphin_, 127 D.P.R. at n.11.  The _Dolphin_ court
focused on whether a business's rights were harmed when its
employees left and contracted with a competitor.  _Id._  By requiring
harm to the business's rights, as opposed to a more freewheeling
inquiry into any harm suffered by the business, _Dolphin_ secures
autonomy and freedom of contract in some circumstances while
sacrificing it to the protection of third parties in other
instances.

A closer inspection further reveals the nature
of the balance struck.  The rights relevant to the _Dolphin_ court's
inquiry into injury were those associated with the "right to
require . . . employees to stay with the company." _Id._  Thus, the
_Dolphin_ court was interested in the relatively narrow question of

whether the Puerto Rico business held a right which by its very nature limited the autonomy of the other contracting parties.  <u>See</u> <u>id.</u>  Stated another way, the injured right must be incompatible with the contracting parties' exercise of autonomy.  <u>See</u> <u>Dennis</u>, 21 P.R. Offic. Trans. at 202-0.  This narrow inquiry tips the scale decidedly in favor of contractual freedom.

        The <u>Dolphin</u> court, of course, could have asked other questions that would have better protected third parties at the expense of contractual freedom.  For instance, the court might have asked whether the disputed contract adversely affected any right held by the Puerto Rico business.  Or, to provide even more protection to third parties, the <u>Dolphin</u> court might have simply inquired whether the disputed contract harmed the Puerto Rico business in some way.  By focusing on the narrow question, the <u>Dolphin</u> court identifies the type of injury a third party must show and, consequently, the balance meant to be struck by the <u>Dennis</u> doctrine.

        The picture becomes even clearer when the <u>Dennis</u> court's application of the injury requirement is layered on.  The <u>Dennis</u> court found injury because the sale of the property "eliminated the 'exclusive reserve of the right' to buy [the property]" in the third party's option.  21 P.R. Offic. Trans. at 204.  In other words, the third party in <u>Dennis</u> did in fact have

a right to limit the property owner's freedom to sell the property to another.  As such, the facts in <u>Dennis</u> are distinguishable from those in <u>Dolphin</u>.

The <u>Dolphin</u> court's application of the <u>Dennis</u> test also fits within the quilt of common law cases regulating contracts that harm third parties.  As one treatise explains, "[a] number of decisions declare illegal a bargain necessarily involving a breach of a previous contract with another party." <u>Williston on Contracts</u>, § 16:14, at 484–85.  And while "[a] bargain of employment which to the knowledge of the parties violates an existing contract with another has been held invalid, . . . . [i]t is not generally wrongful . . . to offer better terms to another's employee so long as the latter is free to leave." <u>Id.</u> at 489–90.

A similar consideration is evident in <u>Twin County Grocers</u>, 81 F. Supp. 2d at 292.  Any sale between a seller and her customers is likely to take wealth away from the seller's competitors. <u>See</u> Caruso, 59 Harv. Int'l L.J. at 390.  The lesson of <u>Twin County Grocers</u>, however, is that this type of externality is not cause to nullify a contract pursuant to <u>Dennis</u> without something more, like a contract by which the seller's competitor had a right to that sale.  81 F. Supp. 2d at

Another insight can be gleaned from <u>Dolphin</u>. The opinion makes clear that, pursuant to the local laws and

constitutional protections being evaluated, an employer and
employee could agree that the employee cannot resign from a job at
any time or for any reason.  127 D.P.R. 869.  It is thus apparent
that the Puerto Rico business could have chosen, but did not
choose, to obtain the right necessary to a Dennis claim.  Stated
another way, the Puerto Rico business decided, through its autonomy
and contractual freedom, to structure its contractual relation
with the employees in such a way that made it vulnerable to the
precise type of harm of which it complained.  In this situation,
protecting the Puerto Rico business from harm as a third party to
one contract would simultaneously undo the business's decision
regarding that same harm reflected in its own contract with some
of the same persons that were also parties to the allegedly harmful
contract.  The Dennis doctrine is not an insurance policy for one's
own exercise of autonomy.  Whether this insight is animated through
the prism of the injury element to the Dennis test or through
another of the test's elements, it appears to be a motivating
factor behind the Dolphin court's decision.

### 3.  Decision

Defendant has failed plausibly to allege a Dennis
claim, even assuming defendant is correct in its characterization
of the foreclosure sale agreement as erasing the debt between Wind
Farm and Punta Lima and the amended foreclosure sale agreement as

reviving the debt.   See Docket No. 177 at p. 13 (alleging characterization); Docket No. 178 at p. 15 (same).  Defendant has failed because it does not allege a specially protected interest and because its juridical relationship is not incompatible with the disputed contract.

Defendant's beef is with the amended foreclosure sale agreement.  Once plaintiffs agreed to the foreclosure sale agreement and extinguished the debt, defendant says, the subordination agreement no longer kept defendant from collecting rent owed pursuant to the land leases.  See Docket No. 177 at p. 13; Docket No. 178 at p. 14-15.  By reviving the extinguished debt through the amended agreement and thereby triggering the subordination agreement once again, defendant seems to argue, plaintiffs injured its right to collect the land leases rent.  See Docket No. 177 at pp. 14-17; Docket No. 178 at pp. 16-19.

Defendant's argument misses the mark.  Defendant alleges no right limiting Wind Farm from extinguishing, reviving, increasing, decreasing, or otherwise altering Wind Farm's debt to Punta Lima.  Thus, defendant alleges no right (i) that was injured by the amended foreclosure sale agreement and (ii) whose very nature limited the autonomy of Wind Farm and Punta Lima to enter the amended foreclosure sale agreement.  Defendant may have a right or interest injured by the amended foreclosure agreement (as

defendant construes that agreement), but nowhere does defendant allege a right incompatible with the agreement. Consequently, defendant does not plausibly allege a Dennis claim. See Dolphin, 127 D.P.R. at n.11; Dennis, 21 P.R. Offic. Trans. at 202-04; see generally Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 570; Zenón, 924 F.3d at 615-16.

There is a separate reason why defendant is not a prejudiced third party with a cognizable Dennis injury. Defendant entered the subordination agreement. See Docket No. 177 at p. 3; Docket No. 178 at p. 3. That exercise of autonomy defeats defendant's interests in bringing a Dennis claim.

"Essential" to be a prejudiced party, the Dennis court explained, "is the incompatibility between the juridical position of the injured third persons and the effects derived from the contract." 21 P.R. Offic. Trans. at 202. The Dennis court found the juridical position of the third party's option contract "radically incompatible" with the sale contract. Id. at 202-03.

Here, by contrast, defendant's juridical relation to plaintiffs includes the subordination agreement. Thus, defendant chose to structure its relationship to Wind Farm in a manner that made it vulnerable to the precise type of harm of which it now complains. The Dennis doctrine does not allow defendant to so impinge on Punta Lima's and Wind Farm's contractual freedom,

and ignore defendant's own exercise of autonomy, to nullify the two parties' amended foreclosure sale agreement as a result of harm that defendant chose to make possible. See Dolphin, 127 D.P.R. at n.11; Dennis, 21 P.R. Offic. Trans. at 202-03.

As a result, the Court need not reach the other asserted bases for dismissal of defendant's amended first counterclaim against each plaintiff. See Dolphin, 127 D.P.R. at n.11; Triangle Cayman Asset, 278 F. Supp. 3d at 519. Plaintiffs' motion to dismiss the amended first counterclaims, see Docket No. 148 at pp. 8-19; Docket No. 180 at pp. 1-2, is **GRANTED**. Defendant's amended first counterclaim against Wind Farm, see Docket No. 177 at pp. 14-17, and defendant's amended first counterclaim against Wind Farm, see Docket No. 178 at pp. 16-19, are **DISMISSED WITH PREJUDICE**.

**B.   Defendant's Amended Fifth Counterclaims**

**1.   The Parties' Positions**

Defendant's fifth counterclaims originally sought a declaratory judgment that the O&M agreement is still in force. See Docket No. 130 at pp. 47-49; Docket No. 131 at pp. 34-36. Plaintiffs moved to dismiss the counterclaims because of a mandatory arbitration clause. See Docket No. 148 at pp. 3-6. Defendant then amended its counterclaims. See Docket No. 177 at p. 1 n.1; Docket No. 178 at p. 1 n.1. Plaintiffs subsequently

moved to dismiss the amended fifth counterclaims. <u>See</u> Docket No. 180 at pp. 1–2.

Defendant now seeks a permanent injunction against Wind Farm. Defendant asks the Court to enjoin Wind Farm from terminating the O&M agreement. <u>See</u> Docket No. 177 at pp. 22–24. The term of the O&M agreement, defendant notes, is coincident with the term of an agreement between Wind Farm and another entity. <u>Id.</u> at pp. 22–23. Defendant alleges that Wind Farm unlawfully terminated the other agreement and used this unlawful termination to end the O&M agreement. <u>Id.</u> at pp. 23–24.

Defendant also brings a claim of tortious interference with contractual relations against Punta Lima. <u>See</u> Docket No. 178 at pp. 24–26. The basis for the claim, it seems, is that Punta Lima directed Wind Farm to terminate the O&M agreement unlawfully. <u>See</u> <u>id.</u> at p. 26.

### 2. Applicable Law

Rule 13(i) authorizes the Court to order separate trials and judgments on a counterclaim. Fed. R. Civ. P. 13(i); <u>see</u> <u>Gutor Int'l AG v. Raymond Packer Co., Inc.</u>, 493 F.2d 938, 944 n.10 (1st Cir. 1974). The Court has substantial discretion in deciding whether to bifurcate a trial. <u>See</u> <u>McLaughlin v. State Farm Mut. Auto. Ins. Co.</u>, 30 F.3d 861, 870 (7th Cir. 1994). The Court may exercise this discretion "[f]or convenience, to avoid

prejudice, or to expedite and economize," Fed. R. Civ. P. 42(b),
to avoid inequitable delay, <u>Gutor</u>, 493 F.2d at 944 n.10, if
expedition of certain claims is necessary to promote the interests
of justice, <u>Warshawsky & Co. v. Arcata Nat'l Corp.</u>, 552 F.2d 1257,
1264 (7th Cir. 1977), and "in furtherance of judicial convenience,
to avoid prejudice, or when separate trials will be conducive to
expedition and economy," <u>Local Union No. 38, Sheet Metal Workers'
Int'l Ass'n, AFL-CIO v. Pelella</u>, 350 F.3d 73, 93 n.1 (2d Cir. 2003)
(Straub, J., dissenting).

### 3.    Decision

The interests of justice would not be served by
adjudicating defendant's amended fifth counterclaims against Wind
Farm and Punta Lima in the same trial as the other claims and
counterclaims in these cases.   The amended fifth counterclaims
involve two agreements, neither of which, according to the parties'
allegations, plays a substantial part in any of the other claims
or counterclaims in these cases.   <u>See</u> Docket Nos. 119, 120, 177,
178.   Additionally, to prove the amended fifth counterclaims,
defendant seeks extensive discovery that could take many months to
obtain pursuant to the Hague Convention on the Taking of Evidence
Abroad in Civil or Commercial Matters ("Hague Convention").   <u>See</u>
Docket No. 139 at pp. 6-7.   Separating the trial on the amended
fifth counterclaims will promote convenience to the Court and

parties, avoid prejudice and inequitable delay to plaintiffs, and expedite and economize adjudication of the other claims and counterclaims in these cases. Consequently, pursuant to Federal Rule of Civil Procedure 13(i), the Court orders that defendant's amended fifth counterclaim asserted against Wind Farm, see Docket No. 177 at pp. 22–24, and its amended fifth counterclaim asserted against Punta Lima, see Docket No. 178 at pp. 24–26, will be adjudicated at a separate trial. Plaintiffs' motion to dismiss the amended fifth counterclaims, see Docket No. 180 at pp. 1–2, will be decided at a later time.

## C. Defendant's Amended Sixth Counterclaim

### 1. The Parties' Positions

Defendant's amended sixth counterclaims assert that the plaintiffs are each liable for unjust enrichment pursuant to Ortiz-Andújar v. Commonwealth of Puerto Rico, 22 P.R. Offic. Trans. 774, 780 (1988). See Docket No. 177 at pp. 24–25; Docket No. 178 at pp. 26–27. Defendant alleges that Wind Farm and Punta Lima were unjustly enriched at defendant's expense because Punta Lima required Wind Farm to pay rent to Punta Lima while prohibiting rent payments to defendant, thereby "forcing [defendant] to remain tied to a Land Lease for which it received no benefit, while [Punta Lima] benefited from the Facility Lease Agreement rent." See Docket No. 177 at p. 25; Docket No. 178 at p. 27. Additionally,

defendant alleges, plaintiffs were unjustly enriched when they denied land lease rent to defendant while demanding access to its premises and by continuing to leave equipment on defendant's land to this day.  See Docket No. 177 at p. 25; Docket No. 178 at p. 27.

Plaintiffs move to dismiss the amended sixth counterclaims because, according to plaintiffs, the unjust enrichment doctrine is inapplicable here.  See Docket No. 148 at pp. 6–8.  Plaintiffs point to caselaw holding that the unjust enrichment doctrine is inapplicable where there is a legal precept such as a contract.  Id. at pp. 7–8.  Plaintiffs note that some of the enrichment about which defendant complains—continued facility lease rent payments without land leases rent payments—is provided for in the extension agreements between Wind Farm and Punta Lima. Id. at p. 7.

Defendant responds that its unjust enrichment claim focuses on plaintiffs' denial of land lease rent payments to defendant while demanding access to the property.  See Docket No. 171 at pp. 13–14.  Defendant also states again that it is currently being deprived of the use of its property even though there is no contract between the parties.  Id. at p. 14.  In its response, defendant adds an argument that plaintiffs are "appropriating for themselves the potential of the wind generation business that [defendant] conceived."  Id.

### 2.    Applicable Law

The Puerto Rico Supreme Court recognized the unjust enrichment doctrine in Ortiz-Andújar, 22 P.R. Offic. Trans. at 780.  Unjust enrichment occurs "when the laws have not foreseen a situation where a patrimonial shift occurs, which shift cannot be rationally explained by the prevalent body of laws." Id. (internal quotation marks omitted).

There are five elements to an unjust enrichment action.  These are "1) [existence] of enrichment; 2) a correlative loss; 3) nexus between loss and enrichment; 4) lack of cause for enrichment; and 5) absence of a legal precept excluding application of enrichment without cause." Hatton v. Mun. de Ponce, 134 D.P.R. 1001 (1994) (officially translated to English without page numbers).

As is evident in the doctrine's fifth element, a contract governing the dispute at issue renders the unjust enrichment doctrine inapplicable.  P.R. Tel. Co., Inc. v. SprintCom, Inc., 662 F.3d 74, 97 (1st Cir. 2011).  The "unjust enrichment doctrine is applicable to do justice to one party in the absence of a contractual or legal obligation from the other party." Umpierre v. Torres-Díaz, 14 P.R. Offic. Trans. 578, 593 (1983).  "Thus, enrichment is not unjustified as long as there is an equivalent contractual obligation or title acquired by purchase

or by gift, or <u>is the result of a legal or natural obligation</u>."

<u>Ortiz-Andújar</u>, 22 P.R. Offic. Trans. at 786; <u>see also</u> <u>Candelario</u>

<u>del Moral v. UBS Fin. Servs. Inc. of P.R.</u>, 81 F. Supp. 3d 143, 152

(D.P.R. 2014) (Delgado-Hernández, J.) ("Enrichment is considered

just—not unjust—when it results from a contractual obligation,

from a title validly acquired by purchase or gift, or as a result

of a legal or natural obligation.").

   **3.  Decision**

        Defendant pleads itself out of much of its

counterclaims.  According to defendant's allegations, the

extension agreements provided that Wind Farm would continue

payments due pursuant to the facility lease but would not spend

insurance proceeds on, for instance, rent due pursuant to the land

leases.  <u>See</u> Docket No. 177 at pp. 9, 27; Docket No. 178 at pp. 11,

29; <u>see, e.g.</u>, Docket No. 119, Ex. 19 at pp. 2–3 (cited or

referenced in Docket Nos. 177, 178) (stating terms of extension

agreement).  That contract governs much of what defendant contends

is unjust enrichment—facility lease rent payments made at the same

time land leases rent payments were prohibited.  <u>See</u> Docket No. 177

at p. 25; Docket No. 178 at p. 27.  As such, defendant cannot bring

an unjust enrichment claim based on those issues.  <u>P.R. Tel. Co.</u>,

662 F.3d at 97.

Nor can defendant bring an unjust enrichment claim based on plaintiffs' access to the project site, or their demands for access to the project site, occurring before defendant allegedly terminated the land leases. Those matters are governed by the land leases. Accordingly, unjust enrichment is inapplicable to these issues, too. Id.

Another issue raised by defendant in its response to plaintiffs' motion to dismiss—purported unjust enrichment by plaintiffs' "appropriating for themselves the potential of the wind generation business that [defendant] conceived"—also fails. For starters, this issue was not alleged in defendant's amended counterclaims as a basis for a claim of unjust enrichment. See Docket No. 177 at pp. 24–25; Docket No. 178 at pp. 26-27. Furthermore, the assertion is conclusory and vague. And whatever defendant seems to mean by the assertion appears to be governed by the many agreements entered between the parties, including the agreement allowing Punta Lima to foreclose on Wind Farm in the event of certain defaults. So this assertion is not a basis for an unjust enrichment claim, either. Zenón, 924 F.3d at 615–16; P.R. Tel. Co., 662 F.3d at 97.

The only issue remaining is defendant's allegation that plaintiffs have been unjustly enriched by leaving equipment or accessing the project site after defendant allegedly terminated

the land leases.  To be sure, this allegation relies on a finding that defendant validly terminated the land leases, a matter very much in dispute in these cases.  For purposes of deciding plaintiffs' motion to dismiss, the Court will not rule on whether defendant validly terminated the land leases and will assume the land leases were validly terminated.  The Court further observes that plaintiffs have not identified a different legal precept or other reason why the unjust enrichment should not apply to this issue.  With that assumption and observation, defendant has plausibly alleged a claim of unjust enrichment on this issue.  See Oldnar Corp. v. Panasonic Corp. of N. Am., 766 F. App'x 255, 266 (6th Cir. 2019).

For the reasons discussed above, plaintiffs' motion to dismiss defendant's amended sixth counterclaims, see Docket No. 148 at pp. 6-8; Docket No. 180 at pp. 1-2, is **GRANTED IN PART AND DENIED IN PART**.  Defendant's amended sixth counterclaims, see Docket No. Docket No. 177 at pp. 24-25; Docket No. 178 at pp. 26-27, are **DISMISSED WITH PREJUDICE IN PART** to the extent discussed above.

## D.   Defendant's Amended Seventh Counterclaim

### 1.   Parties' Positions

Defendant's amended seventh counterclaims are a veritable kitchen sink of allegations.  See Docket No. 177 at

pp. 25-31; Docket No. 178 at pp. 27-33.   The legal theory is
muddled.   <u>See</u> Docket No. 177 at pp. 25-31; Docket No. 178 at
pp. 27-33.

          The amended counterclaims are entitled "violation
of implied covenant of good faith and fair dealing."  <u>See</u> Docket
No. 177 at p. 25; Docket No. 178 at p. 27.   Defendant begins the
amended counterclaims with a citation to the statutory provision
affirming that contracting parties must act in good faith.   <u>See</u>
Docket No. 177 at pp. 26 (citing 31 L.P.R.A. §§ 3372, 3375); Docket
No. 178 at p. 28 (same).  Defendant also cites statutory provisions
authorizing damage awards, including awards to persons injured by
someone who is guilty of fraud, negligence, or delay in fulfilling
his obligations.   Docket No. 177 at pp. 26 (citing 31 L.P.R.A.
§§ 3018, 3019, 3024); Docket No. 178 at p. 28 (same).   Defendant
further cites article 1077 of the Civil Code of Puerto Rico, which
states that, where an obligated person does not comply with what
is incumbent upon him, "[t]he injured party may choose between
demanding compliance or resolution of the obligation, with
compensation for damages and payment of interest in both cases.
Docket No. 177 at pp. 27 (citing 31 L.P.R.A. § 3052); Docket
No. 178 at p. 29 (same).

          Defendant then contends that "[i]n the present
case, plaintiffs have behaved in bad faith and continue to do so,

making [defendant] eligible for remedy under [Article] 1077 of the Civil Code of Puerto Rico." See Docket No. 177 at pp. 26–27; Docket No. 178 at pp. 28–29. Afterwards, defendant provides a list of "Plaintiffs' continued bad faith throughout the contractual relationships between [Punta Lima], [Wind Farm], and [defendant]." See Docket No. 177 at p. 27–30; Docket No. 178 at p. 29–32. The list, according to defendant, "unequivocally demonstrate[s] a pattern of bad faith conduct in every aspect of plaintiffs' dealings. Plaintiffs clearly acted this way to further advance their goals and interests, with complete disregard of the obligations, terms, and conditions contracted with [defendant] and to its detriment." See Docket No. 177 at pp. 30–31; Docket No. 178 at pp. 32–33.

Defendant's list of plaintiffs' alleged bad faith conduct captures many of the impactful events leading to this litigation. Defendant first takes issue with the fact that the extension agreements provided for Wind Farm to pay facility lease rent while prohibiting Wind Farm using insurance proceeds to pay land leases rent. See Docket No. 177 at p. 27; Docket No. 178 at p. 29. Defendant next complains that Punta Lima did not cure Wind Farm's land leases rent payment default, and seems to connect this to a purported intent by Wind Farm to continue to use defendant's property without paying rent. See Docket No. 177 at p. 28; Docket

No. 178 at p. 30. Defendant also alleges that Punta Lima "manufactured" Wind Farm's facility lease default so that Punta Lima could both (i) foreclose on Wind Farm and (ii) maintain facility lease debt that would, through the effect of the subordination agreement, prevent defendant from collecting land leases rent. See Docket No. 177 at p. 28; Docket No. 178 at p. 30. Another instance of bad faith, defendant states, was Punta Lima's failure to pay itself the termination payment once it acquired control of Wind Farm. See Docket No. 177 at p. 29; Docket No. 178 at p. 31. Relatedly, defendant alleges bad faith in the purchase price that Punta Lima assigned to Wind Farm. See Docket No. 177 at pp. 29-30; Docket No. 178 at p. 31-32. A further instance of bad faith, defendant says, is plaintiffs' decision to revive, through the amended foreclosure sale agreement, the debts that were extinguished through the foreclosure sale agreement. See Docket No. 177 at p. 29; Docket No. 178 at p. 31.

Defendant closes the amended seventh counterclaims by seeking relief pursuant to Article 1077 "for material breach of contract in violation of" the other statutory provisions mentioned above. See Docket No. 177 at p. 31; Docket No. 178 at p. 33. Defendant adds that plaintiffs failed to fulfill contractual stipulations, rejected good faith consequences of those stipulations, and that the actions are dolous and fraudulent. See

Docket No. 177 at p. 31; Docket No. 178 at p. 33. Finally, defendant asks for damages. See Docket No. 177 at p. 31; Docket No. 178 at p. 33.

Plaintiffs move to dismiss the amended seventh counterclaims as failing to state a plausible cause of action. See Docket No. 148 at pp. 19-24. In support, plaintiffs raise a host of arguments.

First, plaintiffs say that to raise a dolo claim there must be a breach resulting from bad faith. Id. at pp. 19-20. Plaintiffs note that the only avoided contractual obligation mentioned in the amended seventh counterclaims is Wind Farm's payment of land leases rent. Id. at p. 20. The nonpayment of the rent does not evince dolo, plaintiffs continue, because defendant erroneously included insurance proceeds in its rental calculations and because plaintiffs have sought to pay rent as part of these cases. Id. at pp. 20-21.

Plaintiffs also argue that their actions were merely those in keeping with agreements. Id. at p. 21. As examples plaintiffs point to actions associated with the extension agreements and the foreclosure sale agreement. Id. at pp. 21-22.

Finally, plaintiffs take issue with allegations of bad faith associated with the purchase price in the foreclosure sale agreement. Id. at pp. 22-23. Plaintiffs suggest that

defendant does not have standing to challenge the price and that defendant is barred by laches from challenging the price. Id.

In response, defendant argues that the Court should not resolve the merits of defendant's claim at this stage. See Docket No. 171 at p. 15. Defendant also argues that a contractual breach is not necessary successfully to bring a claim for violation of the covenant of good faith and fair dealing. Id. Defendant also notes that it has provided to the Court a letter from an insurer stating that insurance proceeds paid thus far are of the same type that defendant identified in its land leases rental calculations, and this document generates a factual dispute that cannot be solved at this stage. Id. at p. 17.

2.   **Applicable Law**

i.   **Duty of Good Faith**

Puerto Rico law implies into contracts the covenant of good faith and fair dealing. P.R. Laws Ann. tit. 31, § 3375; see Cantellops v. Álvaro-Chapel, 234 F.3d 741, 744 (1st Cir. 2000). The duty of good faith applies to contract performance. Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 108-09 (1st Cir. 2001). "Writ large, that requirement serves 'the commendable purpose of injecting ethical content into the legal order.'" New Comm Wireless Servs., Inc. v. SprintCom, Inc.,

287 F.3d 1, 12 (1st Cir. 2002) (quoting <u>Velilla v. Pueblo</u> <u>Supermarkets, Inc.</u>, 11 P.R. Offic. Trans. 732, 736 (1981)).

"'Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" <u>Adria Int'l</u>, 241 F.3d at 108 (quoting Restatement (Second) of Contracts § 205a (1981)). "It is important to highlight that the concept of 'good faith' creates special conduct responsibilities for each case in accordance with the juridical relationship and the end intended by the parties." <u>Century Packing Corp. v. Giffin</u> <u>Specialty Equip. Co., LLC</u>, 438 F. Supp. 2d 16, 26 (D.P.R. 2006) (Acosta, J.).

"In determining whether liability attaches in a particular instance, an inquiring court typically examines the totality of the circumstances." <u>New Comm Wireless</u>, 287 F.3d at 12. "[T]he ethical content of each act must be examined in the light of its particular circumstances." <u>Id.</u> "Liability exists if, in light of all the surrounding circumstances, the party's actions appear arbitrary, deceitful, or animated by some improper purpose." <u>Id.</u>

### ii. Dolo

"[C]ontractual dolo is a broad term that includes deceit, fraud, misrepresentation, undue influence and

other insidious machinations." P.R. Tel. Co., 662 F.3d at 99
(internal quotation marks omitted). "[D]olo in the performance of
obligations is equalized to bad faith." Id. (internal quotation
marks omitted).

        "Dolo entails malice, the intention to do harm
to another's person or property. This is the main difference
between dolo and negligence, and delinquency." Canales-Delgado v.
Pan American World Airways, Inc., 12 P.R. Offic. Trans. 411, 425
(1982) (internal quotation marks omitted). "Dolo entails a
malicious intent to do harm, and is thus differentiated from mere
negligence." Event Producers, Inc. v. Tyser & Co., N. Am., Inc.,
854 F. Supp. 35, 38 (D.P.R. 1993). Dolo "implies will, and not
merely omission." Id.

        "Dolo can take two forms: (1) dolo in the
formation of contracts, and (2) dolo in the performance of
contractual obligations." Portugués-Santana v. Rekomdiv Int'l,
657 F.3d 56, 59 (1st Cir. 2011). Dolo in the formation of contracts
may cause nullification of the contract, while dolo in the
performance of a contract may give rise to damages. P.R. Tel.
Co., 662 F.3d at 99.

        Dolo requires a deceitful and intentional
avoidance of contractual obligations. "Dolus in the performance
of a contractual obligation occurs where a party, knowingly and

intentionally, through deceitful means, avoids complying with its contractual obligation." Casco, Inc. v. John Deere Constr. & Forestry Co., Civ. No. 13-1325, 2015 WL 4132278, at *2 (D.P.R. July 8, 2015) (Delgado-Hernández, J.). "The contracting parties' good faith is presumed; rebuttal of such a presumption requires evidence of intentional fault or bad faith." Gazelle v. MR 314 Fortaleza LLC, Civ. No. 16-2500, 2018 WL 1322155, at *6 (D.P.R. Mar. 12, 2018) (Gelpí, J.).

> A party acts with dolus when that party willfully fails to perform an obligation. . . . [A] finding of *dolus* requires a finding that the breaching party intentionally breached an obligation that it knew was binding, and . . . a court must analyze the subjective intent of the breaching party in order to make a finding of *dolus*.

Servicios Comerciales Andinos, S.A. v. Gen. Elec. Del Caribe, Inc., 145 F.3d 463, 477 (1st Cir. 1998) (citation omitted). One commentator describes it as "the willful and conscious breach of a juridical duty that causes to the other contracting party a damage for which he must answer." Márquez v. Torres-Campos, 11 P.R. Offic. Trans. 1085, 1098 (1982).

### 3. Decision

The slapdash nature of defendant's amended seventh counterclaims has required this Court to expend considerable time in ascertaining what is being alleged. The Court has made a determined effort to understand what defendant is attempting to

set forth.  5 Charles Alan Wright *et al*., Federal Practice and Procedure § 1286 (3d ed. 2010).

The Court construes defendant's allegations as an assertion of dolo because defendant alleges that plaintiffs performed one or more agreements in bad faith.  P.R. Tel. Co., 662 F.3d at 99; Gazelle, 2018 WL 1322155, at \*5 & n.2.  Defendant, it seems, alleges that plaintiffs violated their duty of good faith with dolo.

Half of defendant's amended seventh counterclaims can be lopped off from the start.  None of the contracts discussed in defendant's amended seventh counterclaims concern contracts between defendant and Punta Lima.  The duty of good faith arises from a contractual relation.  P.R. Laws Ann. tit. 31, § 3375; see Cantellops, 234 F.3d at 744; see also Docket No. 178 at p. 28 (citing law providing that the duty of good faith arises from contractual obligations).  So defendant does not allege a duty of good faith to itself that Punta Lima could have violated, with or without dolo.  See, e.g., Yacht Caribe Corp. v. Carver Yacht LLC, 270 F. Supp. 3d 547, 556 (D.P.R. 2017) (Gelpí, J.) (dismissing claim for breach of good faith covenant because there was no contract between the parties); Union de Empleados de Muelles de P.R. PRSSA Welfare Plan v. UBS Fin. Servs. Inc. of P.R., Civ. No. 10-1141, 2011 WL 13213283, at \*14–15 (D.P.R. Mar. 31, 2011)

(Delgado-Colón, J.) (same), <u>vacated in part on other grounds</u>, 704 F.3d 155 (1st Cir. 2013).  As such, defendant's amended seventh counterclaim against Punta Lima, <u>see</u> Docket No. 178 at pp. 27–33, is **DISMISSED WITH PREJUDICE.**

        In fact, there are only two contracts to which defendant is a party mentioned in the amended seventh counterclaim against Wind Farm.  These are the subordination agreement and the land leases.  <u>See</u> Docket No. 177 at pp. 25–31.

        Thus, this Court construes defendant's amended seventh counterclaim against Wind Farm as alleging a claim for violation with dolo of the duty of good faith attendant to the subordination agreement and the land leases.  The alleged bad faith actions listed by defendant, it seems, are meant as factual support for those claims.

        Defendant's amended seventh counterclaim against Wind Farm limps across the line into plausibility.  At every turn, the amended seventh counterclaim depends on inferences of intentional deceit and malice.  <u>See</u> <u>id.</u>  Luckily for defendants, the Court draws all reasonable inferences in favor of the non-movant, <u>Zenón</u>, 924 F.3d at 615–16, and determining motive and intent is an issue often better suited for the trier of fact, <u>Mulero-Rodríguez v. Ponte, Inc.</u>, 98 F.3d 670, 677 (1st Cir. 1996). Taking as true only the facts and contractual interpretations

alleged in defendant's amended counterclaims, the foreclosure sale agreement purchase price and the amended foreclosure sale agreement permit a reasonable inference that Wind Farm intentionally and maliciously avoided its duty of good faith to defendant. See Docket No. 177 at pp. 25–31.

Therefore, plaintiffs' motion to dismiss defendant's amended seventh counterclaims, see Docket No. 148 at pp. 19–24; Docket No. 180 at pp. 1–2, is **GRANTED IN PART AND DENIED IN PART**. As noted, defendant's amended seventh counterclaim against Punta Lima, see Docket No. 178 at pp. 27–33, is **DISMISSED WITH PREJUDICE**, while defendant's amended seventh counterclaim against Wind Farm, see Docket No. 177 at pp. 25–31, is not dismissed.

### E.  Plaintiffs' Motion Regarding Claims to be Heard at Trial

#### 1.  Parties' Positions

Plaintiffs argue that the evidentiary hearing and trial consolidated by this Court, see Punta Lima, 2019 WL 6358215, at *1, 16, should involve either (i) only plaintiffs' claims or (ii) plaintiffs' claims and three of defendant's counterclaims that "mirror" plaintiffs' claims, see Docket No. 136 at pp. 3–5. Plaintiffs argue that the other four counterclaims should be bifurcated and put off to a later date. Id.

Defendant responds that justice, due process, and practical considerations require its claims to be heard at the same time as plaintiffs' claims. See Docket No. 140 at p. 2. Defendant agrees with plaintiffs regarding the complexity of the case, id. at p. 6, and suggests holding a preliminary injunction hearing while delaying the merits trial for a later date, id. at p. 3.

Plaintiffs' reply supports maintaining the consolidated preliminary injunction hearing and merits trial. See Docket No. 147 at p. 5. They also repeat their proposal either to postpone the trial on all of defendant's counterclaims or bifurcate some of the counterclaims. Id. at p. 2.

In a surreply, defendant "disagrees that bifurcation is appropriate if it will require an undue fractioning of claims that are inextricably intertwined with the facts of the complaint and the affirmative defenses." See Docket No. 172 at p. 2. Defendant also references reasons given in its response. Id.

### 2.    Applicable Law

As discussed above, Federal Rule of Civil Procedure 13(i) authorizes the Court to bifurcate the trial and judgment of counterclaims from other claims and counterclaims in a case.

### 3. Decision

Plaintiffs' motion regarding the claims to be heard at trial, <u>see</u> Docket No. 136, is **GRANTED IN PART AND DENIED IN PART**. Defendant's fifth counterclaims against Wind Farm and Punta Lima, <u>see</u> Docket No. 177 at pp. 22-24; Docket No. 178 at pp. 24-26, will be adjudicated at a separate trial as discussed above. Plaintiffs' motion is otherwise denied.

## F. Plaintiffs' Motion to Continue the Hearing and Trial

### 1. Parties' Positions

Plaintiffs ask to postpone the hearing and trial date to February 27, 2020. <u>See</u> Docket No. 151 at p. 4.

Defendant responds that it would agree to a postponement until the end of March or until April 20-24. <u>See</u> Docket No. 157 at p. 5. Defendant says that, before moving to continue the hearing and trial, plaintiffs did not comply with local rules requiring that parties confer before a motion is filed. <u>Id.</u> at p. 2.

Plaintiffs respond that defendant's requested postponement is too long. <u>See</u> Docket No. 163 at pp. 5-6. If the hearing and trial cannot begin on February 27, they ask for commencement as soon as possible after that date. <u>Id.</u> at pp. 6-7. Plaintiffs also say that defendant committed the same error with respect to local rules compliance with which it charges

plaintiffs, and that the local rules allow this Court to manage its caseload without being stymied by a rigid application of the rule on pre-motion conferrals.  Id. at p. 5.

Defendant surreplies that discovery deadlines and briefing on other pending and potential motions in this case make a hearing and trial in late February unworkable.  See Docket No. 172 at pp. 3-4.  Defendant further argues that compliance with the conferral requirement is incumbent on a party seeking a continuance.  Id. at pp. 2-3.

**2.  Decision**

Plaintiffs' motion, see Docket No. 151, is **DENIED**.

**IV.  Conclusion**

Plaintiffs' motion to dismiss the amended counterclaims, see Docket No. 180, is **GRANTED IN PART AND DENIED IN PART.**  That part of the motion pertaining to the amended fifth counterclaim remains pending.  Plaintiffs' first motion to dismiss, see Docket No. 148, is **VACATED AS MOOT.**  Defendant's amended first counterclaims against each plaintiff, see Docket No. 177 at pp. 14-17; Docket No. 178 at pp. 16-19, are **DISMISSED WITH PREJUDICE.**  Defendant's amended fifth counterclaims, see Docket No. 177 at pp. 22-24; Docket No. 178 at pp. 24-26, are bifurcated from the trial on the other claims and counterclaims in these cases.  Defendant's amended sixth counterclaims, see Docket No. 177 at pp. 24-25; Docket

No. 178 at pp. 26-27, are **DISMISSED WITH PREJUDICE IN PART**.
Defendant's amended seventh counterclaim against Wind Farm, see
Docket No. 177 at pp. 25-31, is not dismissed, while the amended
seventh counterclaim against Punta Lima; see Docket No. 178 at
pp. 27-33, is **DISMISSED WITH PREJUDICE**. Plaintiffs' motion
regarding claims to be heard at trial, see Docket No. 136, is
**GRANTED IN PART AND DENIED IN PART**. Plaintiffs' motion to continue
the hearing and trial, see Docket No. 151, is **DENIED**.

Therefore, the upcoming hearing and trial in these cases will
involve, in addition to plaintiffs' motions for preliminary
injunction and claims as discussed in Punta Lima, 2019 WL 6358215,
at *16, certain of defendant's amended counterclaims. The trial
will address defendant's amended second counterclaims, which seek
a declaratory judgment that the subordination agreement is null
and void. See Docket No. 177 at pp. 17-19; Docket No. 178 at
pp. 19-21. The trial will also address defendant's amended third
counterclaims, which seek a declaratory judgment that the land
leases were validly terminated and that defendant is entitled to
collect past due rent. See Docket No. 177 at pp. 19-21; Docket
No. 178 at pp. 21-23. Additionally, the trial will address
defendant's amended fourth counterclaims, which seek a declaratory
judgment that defendant was entitled to collect rent in the amount
it deems appropriate. See Docket No. 177 at pp. 21-22; Docket

No. 178 at pp. 23-24. Defendant's amended sixth counterclaims will only be addressed at the upcoming trial to the extent defendant alleges a claim for unjust enrichment based on the plaintiffs' leaving equipment or accessing the project site after defendant allegedly terminated the land leases. See supra; see also Docket No. 177 at p. 25; Docket No. 178 at p. 27. Finally, the upcoming trial will address defendant's amended seventh counterclaim against Wind Farm for violating the implied covenant of good faith and fair dealing in the land leases and subordination agreement. See supra; see also Docket No. 177 at pp. 25-31.

The parties will inform the Court when they will be able to file a Joint Proposed Pretrial Order, and will provide the Court, **no later than February 18, 2020**, with three alternative dates on which to hold a pretrial conference, three alternative dates on which the trial may commence, and the number of days each party will need to present its case.

Defendant's amended fifth counterclaims, which seek an injunction and damages associated with the O&M agreement, will not be adjudicated at the upcoming trial. Dates for the pretrial conference and trial for the amended fifth counterclaims will be set by separate order.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, February 11, 2020.

                                        s/ Francisco A. Besosa
                                        FRANCISCO A. BESOSA
                                        UNITED STATES DISTRICT JUDGE